[L. A. No. 21666.   In Bank.   Mar. 10, 1953.]

STATE BOARD OF DRY CLEANERS, Appellant, v. THRIFT-D-LUX CLEANERS, INC. (a Corporation) et al., Respondents.

438

Edmund G. Brown, Attorney General, Alberta Gattone and J. Albert Hutchinson, Deputy Attorneys General, for Appellant.

Robert Kingsley as Amicus Curiae on behalf of Appellant.

Adele I. Springer for Respondents.

SHENK, J.—Plaintiff appeals from a judgment of dismissal after the defendants' general demurrer to the amended complaint was sustained without leave to amend. The demurrer is based on the ground that the minimum price provisions of the Dry Cleaners' Act of 1945 (Bus. & Prof. Code, ch. 18, art. 5, §§ 9560-9567), under which the plaintiff sought injunctive relief against the defendant's alleged violations of that act, are in violation of the due process clauses of the state and federal Constitutions. The ruling on the demurrer presents the sole question on appeal.

The act provides for the creation of a State Board of Dry Cleaners consisting of seven members: one from the general

public; two owners of retail plants; two owners of whole-sale plants; and two owners of shops. Article 5, in sections 9560 through 9567, provides for "Minimum Price Schedules." Section 9560 empowers the board to act; section 9561 permits the members of the board to have access to cleaning establishments; section 9562 provides for rules of procedure, notice and hearing. Section 9563 provides:

"The board may establish minimum price schedules for the various items of cleaning, dyeing and pressing services for any city or county or other area as may be determined by the board upon the filing of a petition with it, requesting a minimum price schedule for that . . . area signed by seventy-five per cent (75%) or more of the persons in that . . . area who are licensed under this chapter."

Section 9564 provides:

"Upon receipt of a petition under this article the board shall investigate and ascertain those minimum prices which will enable cleaners, dyers, or pressers in that city or county or other area to furnish modern, proper, healthful and sanitary services, using such appliances and equipment as will minimize the danger to public health and safety incident to such services.

"In establishing minimum price schedules, the board shall consider all conditions affecting the business of cleaning, dyeing and pressing in that city, county, or other area and the relation of those conditions to the public health, welfare and safety."

Section 9565 provides that the board shall conduct a cost survey and states that "the board shall not fix a price for any service at a sum less than that which is shown to be the cost price of such service. . . ."

Section 9566 provides for the readjustment of minimum price levels either on the initiative of the board or on complaint of 51 per cent or more of the persons licensed in the area, if the board determines that "the minimum price so established or any of them are insufficient properly to provide healthful and proper services to the public and to maintain a clean, healthful, safe and sanitary cleaning, dyeing or pressing establishment, or that any minimum price set creates an undue hardship on any licensee under this act . . ."

Section 9567 provides for injunctive relief upon complaint by the board against violators of the minimum price schedules established by the board.

In July, 1947, 75 per cent of those licensed by the board in numerous cities in Los Angeles County petitioned the board to establish minimum prices in both wholesale and retail fields. Basing its action upon its own cost surveys, the board established and published its minimum Price Schedules. In September, 1949, the board filed a complaint charging the defendants with violations of the price schedule and with threats to continue to do so. The board had established a minimum price to be paid for cleaning and pressing a man's suit at $1.00. The defendant Thrift-D-Lux Cleaner was charging 69 cents for the same service.

If the statute can be sustained as constitutional it is because it is a reasonable exercise of the police power of the state. ■ Under the law generally that power extends to legislation enacted to promote the public health, safety, morals and general welfare. ■ It has rightly been said that "such [police] regulations may validly be imposed if they constitute a reasonable exertion of governmental authority for the public good. If there is a proper legislative purpose, a law enacted to carry out that purpose, if not arbitrary nor discriminatory, must be upheld by the courts." (*In re Fuller* (1940), 15 Cal.2d 425, 428 [102 P.2d 321].) ■ However, in the exercise of the police power the law places limits on the discretion of the Legislature. Whether there has been a reasonable exercise of this power is a court question.

It is first contended by the plaintiff that the price fixing features of the statute were designed to protect the public health and safety. The statutory law in California meets this contention head on for it has made detailed and adequate provisions elsewhere for the protection of the public's health and safety through the regulation of the dry cleaning industry. (Chapter 2 [Fire Protection—Clothes Cleaning Establishments] and chapter 3 [Fire Protection—Spotting, Sponging, and Pressing Establishments] of part 2, division 12 of the Health and Safety Code; subchapter 4 [Dry Cleaning Equipment Employing Volatile and Inflammable Solvents] and subchapter 5 [Spotting, Sponging and Pressing Establishments] of chapter 1 [State Fire Marshal], title 19 [Public Safety] of the California Administrative Code; article 6 [Laundry, Dry Cleaning, and Dyeing Industry], chapter 5 [Division of Industrial Welfare], title 8 [Industrial Relations] of the Administrative Code; chapter 2 [Safety Devices and Safeguards], part 1 [Workmen's Safety], divi-

sion 5 [Safety in Employment] of the Labor Code.) It is not contended that the present statute is invalid merely because the Legislature could reach the purported objective through the enforcement of the provisions of the above cited statutes. ■ The previous enactment of these statutes furnish support for the conclusion that they were designed to and do fully protect the public health and safety and that the price-fixing features of the present statute have no function to that end. On the contrary they constitute an unnecessary and unreasonable restriction on the pursuit of private and useful business activities. The asserted objective of those portions of the statute are not in fact their real objective. There is therefore nothing relating to the price charged for such services that has any real or substantial relationship to the public health or safety.

■ The proponents of the validity of the statute would justify it in the light of troubled conditions which they claim existed prior to World War II, although they are adverse to applying legal concepts generally accepted during that same period. The statute does not purport to be nor can it be justified as a war or emergency measure. During periods of emergency such as a state of war or of general economic distress the courts have recognized a broad legislative discretion dealing with such situations in the interest of the public welfare. It does not appear that at the time this legislation was enacted there was any such general emergency affecting all private businesses alike. There is nothing in the dry cleaning business which distinguishes it from the multitude of other businesses offering services to the general public. The disturbances and violence which are said to have existed in the dry cleaning business during the period of economic stress prior to the last World War were common to other businesses. It is important to note that the statute itself in no way purports to prevent destructive and unfair competition or to suppress violence.

■ It is claimed that the price-fixing portions of the statute were enacted to provide for the general welfare. But a legislative body may not, under the guise of providing for this component of the police power, impose unnecessary and unreasonable restrictions upon the pursuit of these useful activities. ■ If a statute has no real or substantial relation to any legitimate police power objective, it is the duty of the court to so declare. (*McKay Jewelers, Inc.* v. *Bow-*

*ron,* 19 Cal.2d 595, 600 [122 P.2d 543, 139 A.L.R. 1188].)
■ In this connection it is recognized that every intendment will be indulged in favor of the constitutionality of a legislative enactment (*Hart* v. *City of Beverly Hills,* 11 Cal.2d 343 [79 P.2d 1080]), but the presumption of constitutionality is not conclusive.

The question of the validity of a price fixing law as related to the general welfare was involved in the case of *In re Herrick* (1938), 25 Cal.App.2d 751 [77 P.2d 262]. There the court declared unconstitutional an ordinance which fixed a minimum price for the cleaning of a man's suit of clothes. The declared purpose of the ordinance was "the restoration and maintenance of the highest practical degree of public welfare." The court in that case relied on the decision in *In re Kazas* (1937), 22 Cal.App.2d 161 [70 P.2d 962], which had declared unconstitutional an ordinance for fixing minimum prices for a haircut and shave. In considering whether legislation aims to promote the public welfare as a component part of the police power, the court properly recognized that the concept of public welfare had undergone a process of development through the years. Traditionally the power to legislate for the public welfare was not much more comprehensive than the power to legislate for the public health, safety and morals. In *Munn* v. *Illinois* (1876), 94 U.S. 113 [24 L.Ed. 77] it was considered that only where a person had entered the field of public service in the use of his property did he consent to its regulation for the public welfare. ■ In this state and elsewhere it is established that at least where a business is "affected with a public interest or clothed with a public use" it may be regulated under the general welfare concept. (*Nebbia* v. *New York,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940] ; *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. 2d 550, 582 [55 P.2d 495].) In the Nebbia case a New York statute establishing a minimum price for the milk industry of that state was upheld on the ground that the end sought was within the scope of the legislative power of the state to insure an adequate supply of wholesome milk for public consumption.

■ It is argued that the "affected ·with a public interest" doctrine was abandoned in the Nebbia case. On the contrary that case may be cited merely for an interpretation of that doctrine. At page 536 the court stated that the phrase can mean "no more than that an industry, for ade-

quate reason, is subject to control for the public good.'' (See, also, *Olsen* v. *Nebraska*, 313 U.S. 236, 245-246 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500].) If the phrase means only what the Supreme Court has said it means, then it remains an adequate test. It does not imply that some particular industries are and others are not subject to control. It means that where the control is for the public good any industry may be regulated, provided there is ''adequate reason'' for it. That ''adequate reason'' can only be to achieve a purpose within the police power of the state. The test emphasizes that the control must be for the ''public good.'' ▇ When the ''affected with a public interest'' doctrine is applied in this sense it is an adequate and proper test. As it was traditionally applied to confine regulation to only those industries in the nature of public utilities it is admittedly no longer so limited.

▇ Regardless of the legal terminology used in defining the test employed, any legislation to be justified and supported by the concept of ''general welfare'' must aim to promote the welfare of a properly classified segment of the general public as contrasted with that of a small percentage or a special class of the body politic where no such classification can be justified. In the Kazas case the court held that the ordinance legislated for the benefit of barbers alone, who made up 2 per cent of the community, and that the ''ordinance does not purport to consider the welfare of the other ninety-eight per cent of the population of the city nor the effect on them of fixing the minimum prices to be charged for cutting their hair or shaving their masculine faces.'' It was also held ''that on the face of the ordinance it affirmatively appears that the legislation was not intended to promote the general welfare of the people . . . but only a small group composing a very small proportion of the population. . . .'' As further evidence that the ordinance did not consider the interests of the general public, the court noted that the ordinance ''attempted to pour all barbers and barber shops into a common mold, turning them out exactly alike regardless of skill or efficiency of operation, excellence and completeness of equipment, desirability of location or expense of conducting business.''

▇ The statute before us is not dissimilar to that considered in the Kazas case. It seeks to establish but a single grade of work in the dry cleaning industry and to eliminate the economical cleaning job. It does not take into considera-

tion the "skill or efficiency of operation, excellence and completeness of equipment, desirability of location or expense of conducting business." It does not consider that a substantial group of the public may choose to purchase a cheaper grade of cleaning for particular garments, knowing that they are not obtaining the quality of service offered by more expensive establishments. The statute does not purport to prevent the imposition of fraud upon the public, nor to eliminate destructive and unfair competition, which practices are adequately legislated against in the Unfair Practices Act (Bus. & Prof. Code, div. 7, pt. II, chap. IV). As in the Kazas case, this statute would seemingly have the effect of enhancing the economic status of the industry and enlarging the profits of each operator. The record shows that an advance in prices will benefit less than 1 per cent of those persons who comprise the dry cleaning operators in Los Angeles County. On principle the standards here involved are indistinguishable from the standards considered in that case. Indeed it is argued that the circumstances in that case presented an even greater reason for upholding the enactment; that it was decided upon a declared state of emergency in unemployment affecting the peace and welfare of the city, and affecting an industry more personal in nature and therefore more subject to regulation. But the court concluded that "the private advantage of a small group, not a class, composing a small percentage of the population . . . does not make a price fixing ordinance for that group alone legislation for the general welfare. . . ."

The plaintiff seeks a reversal on the ground that since the decision in the Kazas case in 1937 the judicial treatment of legislation dealing with an exercise of the police power has advanced to a point where the principles of that decision should not be controlling. It is particularly asserted that the "error in the Kazas case is the holding that in order to regulate the prices in an industry that industry must be 'clothed with a public use' in the old and traditional sense of that term." However the use of the phrase was in reference only to the fact that the barbering business is not so "clothed with a public interest" that the welfare of the industry itself is directly related to the welfare of the public. The use the court made of the phrase "affected with a public interest" in the Kazas case was in the same sense that the Olsen and the Nebbia cases (*Olsen* v. *Nebraska, supra,* 313 U.S. 236; *Nebbia* v. *New York, supra,* 291 U.S. 502) had used it, namely, as an aid to determine when a statute provides for

the general welfare. This was indicated in the Kazas case by a citation of the following excerpt from *State* v. *Ives,* 123 Fla. 401 [167 So. 394] : "Such a regulation could be justified only upon the fact that the barber trade is a paramount industry of the state intimately connected with its welfare, so that the state may, through an agency such as the board of barber examiners, prescribe prices for the services to be rendered by each barber. . . .

"Reduced to its last analysis, the thought underlying the act seems to be not that the barber trade is a paramount industry affecting the general welfare, but that the prosperity of the barber class sufficient to maintain the average barber and his family 'properly' is a sufficient reason for the exercise by the state of the power of direction, control and management of the barber business. . . ."

Although the Florida Supreme Court in a later decision (*Miami Laundry Co.* v. *Florida Dry Cleaning & Laundry Board* (1938), 134 Fla. 1 [183 So. 759]), upheld the validity of a statute regulating prices in the dry cleaning industry, it reiterated its position in regard to the use of the "affected with a public interest" phrase as employed in its modern sense. The court said: "There is no magic in the phrase 'clothed with or affected with a public interest'. Any business is affected by a public interest when it reaches such proportions that the interest of the public demands that it be reasonably regulated to conserve the rights of the public. . . ." This statement of the doctrine is in accord with its application in the Kazas case. If it may be said that the Florida court in the Miami Laundry Co. case abandoned its position in the Ives case it apparently did so on the theory that the Supreme Court of the United States had, in the Nebbia case, thrown open to price regulation all lines of business legislatively declared to be affected with the public interest and therefore subject to price control. The able dissenting opinions in the Miami Laundry Company case would seem to be clearly in accordance with the weight of authority.

Returning to the Kazas case it must be said that it correctly employed the "affected with a public interest" phrase in the same manner as that phrase was employed in the Nebbia case three years earlier. Because of the closeness of the milk industry to the public health the Supreme Court saw fit to classify it as "affected with a public interest," or subject to price regulation for the public good. But it does not follow that all other businesses in which the public is served should

fall within the same classification. If they do there is no limit which the Legislature is bound to respect and all businesses are subject to its uncontrolled power to fix prices.

The doctrine of the Kazas case has been followed in other jurisdictions. (*Kent Stores* v. *Wilentz*, 14 F.Supp. 1; *Becker* v. *State*, 7 Harr. 454 [185 A. 92] ; *Mobile* v. *Rouse*, 233 Ala. 622 [173 So. 266, 111 A.L.R. 349].) The most recent decision declaring unconstitutional a minimum price statute similar to the present case was announced by the Supreme Court of Oregon on April 2, 1952. In *Christian* v. *La Forge*, 194 Ore. 450 [242 P.2d 797], that court declared that ''perhaps the best discussion of the subject is to be found in *In re Kazas, supra.*'' The Oregon court quoted at great length from that opinion and declared invalid the statute before it on the same reasoning. Additional decisions in other states which have expressly followed the Kazas case are the following: *Edwards* v. *State Board of Barber Examiners* (1951), 72 Ariz. 108 [231 P.2d 450] ; *Revne* v. *Trade Com.* (1948), 113 Utah 155 [192 P.2d 563, 3 A.L.R.2d 169] ; *State Board of Barber Examiners* v. *Cloud* (1942), 220 Ind. 552 [44 N.E.2d 972]. The case is recognized as a leading authority by the highest courts of sister states and receives the approval of this court. Seeking its disapproval the plaintiff states that the decision in the case of *In re Lasswell*, 1 Cal.App.2d 183 [36 P.2d 678], has been completely ignored. That case upheld the constitutionality of the California Industrial Recovery Act, and particularly held that provisions fixing minimum prices in the dry cleaning industry were valid. The decision in that case has been properly ignored. The California Industrial Recovery Act was legislation enacted to supplement the National Industrial Recovery Act of 1933, and in effect adopted the federal statute to extend its application to intrastate commerce. In effect the Supreme Court of the United States in *Schechter Poultry Corp.* v. *United States*, 295 U.S. 495 [55 S.Ct. 837, 97 A.L.R. 947], overruled *In re Lasswell* and rendered inoperative the California price fixing statute. The Lasswell decision cannot therefore be relied upon as authority for the validity of the price fixing provisions of the present statute.

In *Wholesale Tobacco Dealers Bureau* v. *National Candy & Tobacco Co.* (1938), 11 Cal.2d 634 [82 P.2d 3, 118 A.L.R. 486], this court sustained the Unfair Practices Act. The court there held that the purpose of the act was the prevention of destructive competition and injury to com-

petitors. That is a legitimate objective in the interest of the general welfare, and on this basis is distinguishable from the present statute.

In *Jersey Maid Milk Products Co.* v. *Brock* (1939), 13 Cal.2d 620 [91 P.2d 577], this court upheld the constitutionality of the Milk Stabilization Act (Agr. Code, chap. 10, div. IV), involving the regulations including the fixing of minimum prices in the sale of fluid milk. The statute there under consideration is clearly distinguishable from the present one on the same basis as is *Nebbia* v. *New York* (1934), *supra*, 291 U.S. 502. There as before stated it was held that there is a public need for a constant supply of pure, wholesome milk; that the milk industry concerns not only the economic welfare but the health of the public in general, and legislation which aims to protect that general welfare through an initial protection of an industry is within the scope of the police power. The effect of the statute here involved is to protect the industry only—a small segment of the general public. On this same ground, the decision in *Agricultural Prorate Com.* v. *Superior Court* (1936), *supra*, 5 Cal.2d 550 is not in point.

In *Max Factor & Co.* v. *Kunsman*, 5 Cal.2d 446 [55 P.2d 177], the validity of the Fair Trade Act was upheld. That act does not involve alone the question of legislative authority in the field of price regulation. It is an act to enforce contracts, express or implied, between vendors and vendees in which they agree to maintain specified standards of prices upon trade-marked commodities. Although the retailer in that case had not expressly been a party to the agreement, nevertheless a majority of the court held that an agreement to sell at the fixed price was implied when that retailer ordered goods which he knew or should have known were fair trade items. The court stated at page 464: ''The statute . . . is aimed at protecting these valuable property and contract rights of the manufacturer or producer—rights just as valuable and just as much entitled to protection as the right of the retailer, who is attempting, by exercising his claimed right of freedom of action, to injure the property and contract rights of the manufacturer or producer. The statute, in other words, does not merely prohibit price-cutting in order to regulate prices, but prohibits price-cutting in an attempt to protect the validly acquired rights of others.'' The Max Factor case affords no support for the plaintiff's position.

It must be concluded that the price fixing provision of the statute here involved is invalid because it is not, by any recognized or recognizable standard, an enactment providing for the public health, safety, morals, or general welfare.

The defendant points to another ground upon which the invalidity of the statute may well be based. Section 9564 of the code requires that the "board shall investigate and ascertain those minimum prices which will enable cleaners, dyers, or pressers in that . . . area to furnish modern, proper, healthful and sanitary services, using such appliances and equipment as will minimize the danger to public health and safety incident to such services." The only other reference to an established standard is in section 9566 as follows: "At the conclusion of an investigation therefor, the board may establish a reasonable and just minimum price schedule conforming to the requirements of this article." ▪▪▪ While the delegation of governmental authority to an administrative body is proper in some instances, the delegation of absolute legislative discretion is not. To avoid such a result it is necessary that a delegating statute establish an ascertainable standard to guide the administrative body. ▪▪▪ Here [the statute assumes to confer legislative authority upon those who are directly interested in the operation of the regulatory rule and its penal provisions with no guide for the exercise of the delegated authority. The board is made up of six active members of the industry, and one member of the public at large. The initiation of the proposed control is at the insistence of 75 per cent of the cleaners in the area. In declaring invalid the Bituminous Coal Conservation Act of 1935, the United States Supreme Court stated: ". . . one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question." (*Carter* v. *Carter Coal Co.,* 298 U.S. 238, 311. [56 S.Ct. 855, 80 L.Ed. 1160].)

In *Becker* v. *State, supra,* 7 Harr. 454, the Supreme Court of Delaware set aside the Delaware Dry Cleaning Law. It stated that "vast authority is centered in a governing board, a majority of which are directly interested in the industry,

but who, nevertheless are empowered to act in a judicial capacity, and to sit in judgment over fellow members of the trade. Too great a strain is imposed upon human frailty. The practical tendency of the legislation is to create and foster monopoly, to prevent, not to encourage, competition, to maintain maximum, not minimum prices, all of which is against, not in aid of, the interests of a consuming public.''

"Where the Legislature attempts to delegate its powers to an administrative board made up of interested members of the industry, the majority of which can initiate regulatory action by the board in that industry, that delegation may well be brought into question.'

From the foregoing it follows that the price fixing provisions of the statute under attack must fall on the constitutional grounds stated, and that the demurrer was properly sustained.

The judgment is affirmed.

Edmonds, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J.—In my opinion the minimum price provisions of the Dry Cleaners' Act of 1945 do not violate the due process clause of either the United States Constitution or the California Constitution.

The Legislature has power to determine the rights of persons, subject only to the limitations of the United States Constitution and the California Constitution. (*Modern Barber Colleges, Inc.* v. *California Emp. Stab. Com.*, 31 Cal.2d 720, 726 [192 P.2d 916] ; *Delaney* v. *Lowery,* 25 Cal.2d 561, 568 [154 P.2d 674] ; *Collins* v. *Riley,* 24 Cal.2d 912, 916 [152 P.2d 169].) A statute regulating commercial transactions does not violate the due process clause of either Constitution unless it is proved so unreasonable as to dispel the presumption that it rests upon some rational basis within the knowledge and experience of the legislators. (*Olsen* v. *Nebraska,* 313 U.S. 236, 246 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500] ; *United States* v. *Carolene Products Co.,* 304 U.S. 144, 154 [58 S.Ct. 778, 82 L.Ed. 1234] ; *Serve Yourself Gas. etc. Assn.* v. *Brock,* 39 Cal.2d 813, 817 [249 P.2d 545] ; *In re Fuller,* 15 Cal.2d 425, 428 [102 P.2d 321] ; *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 636 [91 P.2d 577] ; *Wholesale Tobacco Dealers Bureau* v. *National Candy & Tobacco Co.,* 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486].) Judicial inquiry "where the legislative judgment is drawn into ques-

tion, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it." (*United States* v. *Carolene Products Co., supra,* 304 U.S. 144, 154.) The statute in the present case, like any other regulation of private enterprise, must be considered in this light.

Although early decisions held that prices could not be regulated unless the industry was clothed with a public interest (see *Ribnik* v. *McBride,* 277 U.S. 350 [48 S.Ct. 454, 72 L.Ed. 913]), the United States Supreme Court discarded that test in *Nebbia* v. *New York,* 291 U.S. 502, 531-539 [54 S.Ct. 505, 78 L.Ed. 940]. (See, also, *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 [57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330].) In *Olsen* v. *Nebraska,* 313 U.S. 236, 244 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500], the court in' a unanimous opinion overruled the Ribnik case and refused to inquire into the wisdom of the challenged legislation. The Olsen decision reversed the decision of the state court, 138 Neb. 574 [293 N.W. 393], holding the price-fixing statute in question unconstitutional. This court soon followed the lead of the United States Supreme Court. (*Wholesale Tobacco Dealers Bureau* v. *National Candy & Tobacco Co., supra,* 11 Cal.2d 634, 655.) The Legislature, therefore, is clearly empowered to prevent destructive price cutting, which has demoralizing effects on business itself and on its service to the public.

The dry cleaning industry has an unhappy history of ruthless competition marked by destructive price cutting and retaliatory sabotage. Early attempts at voluntary price regulation by internal agreements were struck down by the courts. (*Endicott* v. *Rosenthal* (1932), 216 Cal. 721 [16 P.2d 673]; see, also, *In re Herrick* (1938), 25 Cal.App.2d 751 [77 P.2d 262]). Thereafter, price cutting was fought by sabotage. The chaotic state of the industry was brought to light in *People* v. *Cowan* (1940), 38 Cal.App.2d 231 [101 P.2d 125], a murder prosecution arising out of an attempt to sabotage a dry cleaner who cut his prices, and in *People* v. *Black* (1941), 45 Cal.App.2d 87 [113 P.2d 746], a prosecution for conspiracy to commit sabotage by placing metallic potassium in garments sent to a price cutter. It was there revealed that a substantial number of industry members were guilty of unlawful attacks on retailers who cut prices. The industry thereafter, from 1941-1945, achieved stabilization under price regulation by the Office of Price Administration. After the cessation of O.P.A. regulation, the statute now held un-

constitutional was passed by unanimous vote of both houses of the Legislature and signed by the Governor.

The dry cleaning business is highly vulnerable to price wars and their attendant evils. The industry represents millions of dollars in plants and equipment and requires the labor of thousands of skilled workers. It is subject to intense short-period fluctuations. The dry cleaner cannot hedge against these fluctuations by stock-piling inventory or by large-scale buying of raw materials. He cannot supply his market in advance, lay off help, and wait for demand to catch up with supply as a manufacturer ordinarily can. A dry cleaner is under constant pressure to cut his prices, increase his volume, and reduce his costs. Other cleaners follow suit and the price cuts inevitably result in downgrading of service. The cleaning industry is particularly susceptible to downgrading: its processes are highly specialized and it is difficult to police against slipshod performance or to detect it. Destructive price cutting quickly starts a vicious train of sabotage, violence, eventual bankruptcy for many cleaners, and disruption of a service industry essential to the public health.

The statute sets the minimum price schedule as low as is consistent with efficient and sanitary service. (Bus. & Prof. Code, § 9564.) Prices can be fixed only after a cost survey and due investigation by the board. (Bus. & Prof. Code, §§ 9564-9566.) If the board should abuse the discretion vested in it, its action is subject to judicial correction.* (Gov. Code, § 11440.) The statute thus limits the competitive struggle in the industry to the quality of service offered to the public.

The Legislature could reasonably conclude that the economic waste, the loss of property, the violation of law, the threat to health and public convenience, could be prevented by elimination of price warfare through establishment of minimum price schedules. It could reasonably conclude that a measure of economic security would encourage compliance with health and safety regulations and the maintenance of the industry's capacity to meet the fluctuating demand of the public at reasonable prices.

Disruption of business by destructive competition has long been recognized as an evil that may be controlled by the Legislature. Thus in *Max Factor & Co.* v. *Kunsman,* 5 Cal.2d

---

*Defendants contend only that the statute is unconstitutional as a whole. No claim is made that the particular price schedules fixed by the board are unauthorized by the statute.

446 [55 P.2d 177], affirmed, 299 U.S. 198 [57 S.Ct. 147, 81 L.Ed. 122], this court held constitutional a statute requiring retailers to sell products at a price fixed by the wholesaler. The court said: "In the first place, this court has neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. We recognize that economic and juridical thought is, and for many years has been, divided on the economic question as to the benefits to the consuming public of free and open competition, and its necessary corollary, price-cutting. . . . The members of this court may or may not agree with the economic philosophy of the Fair Trade Act, but it is no part of the duty of this court to determine whether the policy embodied in the statute is wise or unwise." (5 Cal.2d at 454-455.) The majority opinion would distinguish the Max Factor case on the ground that the only question there decided was the right to enforce "implied" contracts between vendors and vendees who "should have known" that certain goods were fair trade items. The distinction is untenable. The retailer in the Max Factor case had not at any time agreed to sell at the fixed price and was being compelled by the court to abide by the price determined by the wholesaler. A statute requiring a nonsigning retailer to sell at a fixed price under penalty of an injunction is as much a price fixing statute as is the statute in the present case. The Max Factor case is clear authority for the proposition that the Legislature may enact price fixing legislation, if it determines that price cutting will adversely affect a particular industry to the detriment of the public. In other cases also this court has approved price regulation. (*Jersey Maid Milk Products Co.* v. *Brock, supra*; *Wholesale Tobacco Dealers* v. *National etc. Co., supra*; see, also, *In re Willing,* 12 Cal.2d 591, 594 [86 P.2d 663].) The majority opinion would distinguish the Jersey Maid case on the ground that low milk prices affect the general public, which needs a supply of pure milk, but that dry cleaning prices protect only the industry. Unless this court intends to return to the "clothed with a public interest" test, I see no basis for the proposed distinction of the Jersey Maid case. The question of the need of the legislation in a particular industry is one for the Legislature; this court is not equipped to determine which industries should receive price protection in the public interest and which should not. The majority opinion would distinguish the Wholesale Tobacco case on the ground that

the legislation in that case was designed to prevent destructive competition, a proper legislative objective. The same objective underlies the statute in the present case.

The majority opinion holds that this case is governed by *In re Kazas* (1937), 22 Cal.App.2d 161 [70 P.2d 962], rather than by the cases discussed in the preceding paragraph. The Kazas case, however, turned on the question whether the barber trade was "affected with a public interest," a standard long since discarded by the United States Supreme Court and by this court. (*Olsen* v. *Nebraska, supra*; *Wholesale Tobacco Dealers* v. *National etc. Co., supra.*) Moreover, the Kazas case relied upon *State* v. *Ives*, 123 Fla. 401 [167 So. 394], a case subsequently abandoned by the court that decided it. (*Miami Laundry Co.* v. *Florida Dry Cleaning & Laundry Board*, 134 Fla. 1, 54 [183 So. 759].) I would disapprove the Kazas case as clearly contrary to presently accepted principles of constitutional law.

It is contended that the Dry Cleaners' Act of 1945 could not have the objective of protecting the public health and safety because the Legislature could reach that objective by enforcement of provisions of the Health and Safety Code and of the Unfair Practices Act. This reasoning proceeds from a misconception of this court's function in passing upon the constitutionality of a legislative enactment. The only question before us is whether there is a rational basis for the statute. Questions regarding the wisdom of the legislation are irrelevant. (*Olsen* v. *Nebraska, supra*, 313 U.S. at p. 246.) It was for the Legislature to determine whether additional legislation was necessary to preclude conditions in the dry cleaning industry that would adversely affect the public welfare. An attack on a statute cannot be justified by an assumption that there are wiser methods of reaching the desired objective. (*Hunter* v. *Justice's Court*, 36 Cal.2d 315, 319 [223 P.2d 465].)

A number of decisions from other states have held constitutional the regulation of prices in the dry cleaning and barber industries. (*Miami Laundry* v. *Florida Dry Cleaning Board, supra*; *People* v. *Barksdale*, 104 Colo. 1 [87 P.2d 755]; *State Dry Cleaners' Board* v. *Compton*, 201 Okla. 284 [205 P.2d 286]; *Arnold* v. *Board of Barber Examiners*, 45 N.M. 57 [109 P.2d 779]; *Board of Barber Examiners* v. *Parker*, 190 La. 214, 266 [182 So. 485]; *State* v. *McMasters*, 204 Minn. 438 [283 N.W. 767]; 119 A.L.R. 1481; 111 A.L.R. 353.) The reasoning of the court in the Arnold case is typical of

the foregoing decisions: "The record before us discloses the hazards to the health of that large portion of the public which patronizes barber shops, in the price cutting competition which prevails, absent regulation and fixing of the minimum to be charged. The sanitary requirements set up by earlier act of 1935 (Chap. 111, Laws 1935), appellant urges, are in themselves sufficient to insure health protection and sanitary working conditions. But the record before us offers support to appellees' contention that in price wars and where non-profitable charges are made for barbers' services, the sanitary safeguards are uniformly sacrificed. This was the situation which we have a right to assume the legislature intended to correct. . . . We recognize *Ex parte Kazas,* 22 Cal.App.2d 161 [70 P.2d 962], relied upon by appellant, as authority opposing the constitutionality of a statute similar to our own. It is clearly opposed to the authority relied upon by appellees and to much we have here said. It is quite obvious also that the California court took its position in that case notwithstanding the changed doctrine announced and followed in the Nebbia and West Coast Hotel Company cases, *supra.* We pass further consideration of this case, however, with the observation that in our opinion, it is contrary to the weight of recent authority and the better reasoned decisions, as is also other authority relied upon by appellant." (109 P.2d at 785-786.)

Most of the cases holding statutes regulating dry cleaning and barber prices unconstitutional were decided in 1937 or earlier, before the decision in *West Coast Hotel* v. *Parrish,* 300 U.S. 379 [57 S.Ct. 578, 81 L.Ed. 703; 108 A.L.R. 1330]. Thus, *State* v. *Ives, supra,* 123 Fla. 401, quoted at length in the majority opinion, was decided upon authority of *Adkins* v. *Children's Hospital,* 261 U.S. 525 [43 S.Ct. 394, 67 L.Ed. 785], expressly overruled in the West Coast Hotel case. As previously pointed out, the Florida Supreme Court has abandoned its position in *State* v. *Ives.* Again, the majority opinion relies on *City of Mobile* v. *Rouse* (1937), 27 Ala.App. 344 [173 So. 254.] That decision was cited as controlling by the Louisiana Supreme Court in *Board of Barber Examiners* v. *Parker,* 190 La. 214 [182 So. 485]. Before the decision in the Parker case became final, the United States Supreme Court filed its opinion in the West Coast Hotel case. The Louisiana court thereupon granted a rehearing, reversed its earlier decision relying on the Rouse case, and held the barber statute constitutional. (190 La.

266 [182 So. 485].) Another case cited by the majority, *Becker* v. *State* (1936), 37 Del. 454 [185 A. 92], was also decided before the recent United States Supreme Court cases.

It is true that several recent cases support the majority opinion. (*Christian* v. *La Forge*, 194 Ore. 450 [242 P.2d 797] ; *Noble* v. *Davis*, 204 Ark. 156 [161 S.W.2d 189] ; *State* v. *Greeson*, 174 Tenn. 178 [124 S.W.2d 253] ; *State Board of Barber Examiners* v. *Cloud*, 220 Ind. 552 [44 N.E.2d 972] ; *Edwards* v. *State Board of Barber Examiners*, 72 Ariz. 108 [231 P.2d 450].) The Greeson, Cloud, and Edwards cases expressly relied upon *Lochner* v. *New York*, 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937]. The United State Supreme Court, however, no longer adheres to the constitutional doctrine expressed in the Lochner and similar cases, such as *Adair* v. *United States*, 208 U.S. 161 [28 S.Ct. 277, 5 L.Ed. 436] ; *Allgeyer* v. *Louisiana*, 165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832] ; and *Coppage* v. *Kansas*, 236 U.S. 1 [35 S.Ct. 240, 59 L.Ed 441]. "This Court beginning at least as early as 1934, when the Nebbia case was decided, has steadily rejected the due process philosophy enunciated in the Adair-Coppage line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. See *Nebbia* v. *New York, supra*, at 523-524, and *West Coast Hotel Co.* v. *Parrish, supra*, at 392-395, and cases cited. Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." (*Lincoln Union* v. *Northwestern Iron & Metal Co.*, 335 U.S. 525, 536-537, 542, 557 [59 S.Ct. 251, 260, 267, 93 L.Ed. 212, 6 A.L.R.2d 473].) In view of the Nebbia, West Coast Hotel, and Olsen cases, and the decisions of this court in the Jersey Maid and Max Factor cases, I cannot regard as controlling the decisions from other states holding similar legislation unconstitutional.

As an alternative ground of decision, the majority opinion states that the Dry Cleaners' Act "may well be" unconstitutional because it "assumes to confer legislative authority upon those who are directly interested in the operation of

the regulatory rule and its penal provisions with no guide for the exercise of the delegated authority.''

The members of the State Board of Dry Cleaners are appointed by the Governor and approved by the Senate. They are officials of the state, paid by the state for administering the law, and their acts are reviewed by the judiciary. The fact that six members of the board must be members of the cleaning industry has no constitutional significance. (See *Ex parte Gerino,* 143 Cal. 412, 414 [77 P. 166, 66 L.R.A. 249] [Board of Medical Examiners elected by members of regulated profession] ; *Miami Laundry Co.* v. *Florida Dry Cleaning & Laundry Board,* 134 Fla. 1, 13 [183 So. 759, 764, 119 A.L.R. 956] ; see, also, Davis, Administrative Law, pp. 380-381.) It may be debatable whether the manifest advantages of submitting highly technical problems to an informed tribunal are outweighed by the possible danger that an agency largely composed of members representing an interested economic group may be tempted to act for selfish ends. The Legislature is free to make its choice. (See *Opp Cotton Mills* v. *Administrator of Wage and Hour Div.,* 312 U.S. 126, 144 [61 S.Ct. 524, 85 L.Ed. 624].)

The fact that price regulation is initiated at the insistence of 75 per cent of the cleaners in the area does not present constitutional difficulties. Whatever their special interest in articulating the problem, it remains a general one, of the greatest concern to the public. Governmental processes are commonly set in motion by the petition, complaint, or other action by some individual or group. Thus, the Administrative Procedure Act provides that ''Except where the right to petition for adoption of a regulation is restricted by statute to a designated group . . . any interested person may petition a state agency requesting the adoption or repeal of a regulation. . . . [A] state agency shall within 30 days deny the petition in writing or schedule the matter for public hearing.'' (Gov. Code, §§ 11426-11427.) In *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal.2d 550, 554, 586-587 [55 P.2d 495], this court upheld a statute providing that the details and area of a proration program be determined by the filing of a petition signed by two-thirds of the producers in the area. We rejected there a contention that apparently is accepted in the majority opinion: that the delegation of power to the industry to initiate action invalidated the statute. In *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 645 [91 P.2d 577], we upheld a requirement that 65

per cent of the producers in the regulated industry decide that a stabilization plan should be formulated. (See, also, *Parker* v. *Brown*, 317 U.S. 341, 352 [63 S.Ct. 307, 87 L.Ed. 315] [upholding the statute involved in *Agricultural Prorate Com.* v. *Superior Court, supra*]; *Currin* v. *Wallace*, 306 U.S. 1, 15-16 [59 S.Ct. 379, 83 L.Ed. 441]; *Ray* v. *Parker*, 15 Cal. 2d 275, 286-287 [101 P.2d 665]; Davis, Administrative Law, pp. 71-73.)

*Carter* v. *Carter Coal Co.*, 298 U.S. 238 [56 S.Ct. 855, 80 L.Ed. 1160], is not applicable here. In that case, the prices were fixed by private persons in the industry. The present case is analogous to *Sunshine A. Coal Co.* v. *Adkins*, 310 U.S. 381, 399 [60 S.Ct. 907, 84 L.Ed. 1263], where the United States Supreme Court held the Carter case not controlling and upheld a statutory plan for coal price fixing by which district boards of code members proposed minimum prices, which became effective upon approval by the agency. (See, also, *United States* v. *Rock Royal Co-Op.*, 307 U.S. 533, 577-578 [59 S.Ct. 993, 83 L.Ed. 1446]; Jaffe, *Law Making by Private Groups*, 51 Harv.L.Rev. 201.)

In *Revne* v. *Trade Com.*, 113 Utah 155 [192 P.2d 563, 3 A.L.R.2d 169], it was held that the Utah Legislature had unlawfully delegated to the barber industry the power to fix minimum prices by agreement. That decision, however, is clearly distinguishable. The Utah court said: "We recognize, of course, that the legislature may properly delegate to some administrative body the duty of ascertaining the facts upon which the provisions of a law are to function, and also, that one of the methods of initiating activity on the part of that administrative body may be by petition of the citizens concerned. Such procedure is not in and of itself defective as an improper delegation of legislative authority. The question of an improper delegation of legislative authority lies embedded in the extent of the power granted to the administrative body." (192 P.2d at 567.) The court held the Utah statute invalid on the ground that price schedules were initiated by the members of the regulated industry. The board could not fix prices upon its own initiative; it could only accept or reject the prices suggested by the industry. In contrast, under the Dry Cleaners' Act the board fixes the prices under the standards set forth in sections 9564 to 9566, and the industry has to accept the prices so fixed. Seventy-five per cent of the industry petitions the board to fix a price; the industry does not fix the price.

The provision in the present statute does no more than relieve the board from making an expensive survey at the instance of a few cleaners, and allows it to act only when the need for regulation is apparent to a substantial number of those who would be affected. Far from unlawfully delegating authority, the Legislature has merely restricted its regulations by withholding their operation from a given area until 75 per cent of the cleaners favor it. (See *Currin* v. *Wallace, supra,* 306 U.S. 1, 15-16.)

The majority opinion states that the standards of the statute are an inadequate guide for exercise of the delegated authority. The challenged provision provides that the board "shall investigate and ascertain those minimum prices which will enable cleaners, dyers, or pressers in that . . . area to furnish modern, proper, healthful and sanitary services, using such appliances and equipment as will minimize the danger to public health and safety incident to such services. . . . At the conclusion of an investigation thereof, the board may establish a reasonable and just minimum price schedule conforming to the requirements of this article." (§§ 9564, 9566.) Standards similar to those set forth in foregoing sections of the Dry Cleaners' Act have been repeatedly upheld by this court (*Ray* v. *Parker, supra,* 15 Cal.2d 275, 286-287; *Jersey Maid Milk Products Co.* v. *Brock, supra,* 13 Cal.2d 620, 645; *Agricultural Prorate Com.* v. *Superior Court, supra,* 5 Cal.2d 550, 586-587; *Nelson* v. *Dean,* 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467]) and by the United States Supreme Court. (*American Power & L. Co.* v. *Securities & Exch. Com.,* 329 U.S. 90, 104-106 [67 S.Ct. 133, 91 L.Ed. 103]; *Avent* v. *United States,* 266 U.S. 127, 130 [45 S.Ct. 34, 69 L.Ed. 202]; *Federal Radio Com.* v. *Nelson Bros. Bond & Mtg. Co.,* 289 U.S. 266, 285 [53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406].) Minutely defined standards are not required when, as here, flexibility is desirable. The Legislature cannot and need not anticipate every situation that might arise and supply a rule for each situation. (See *Hampton & Co.* v. *United States,* 276 U.S. 394, 407-408 [48 S.Ct. 348, 72 L.Ed. 624].) In the present case, the Legislature has plainly stated the legislative objective and has established standards adequate to guide the administrative determination of the particular prices that should be fixed to carry out that objective. (See *American Power & L. Co.* v. *Securities & Exch. Com., supra.*)

The real basis for the result reached by the majority opinion

is an adherence to an economic view that minimum price legislation is not in the best interests of the general public. But as Mr. Justice Holmes long admonished, the economic and moral beliefs of the judiciary are not embedded in the Constitution. There is no reason to suppose that judges are better qualified than legislators to determine what social and economic programs should be adopted by the State of California.

I would reverse the judgment on the ground that plaintiff has stated a cause of action under a valid statute.

Gibson, C. J., and Carter, J., concurred.

Appellant's petition for a rehearing was denied April 2, 1953. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.