[Civ. No. 20283.   Second Dist., Div. One.   Feb. 21, 1955.]

THE PEOPLE, Appellant, v. ROBERT A. ASAMOTO,
Respondent.

Edmund G. Brown, Attorney General, Alberta Gattone
and W. R. Augustine, Deputy Attorneys General, for Appellant.

Chuman, McKibbin & Yokozeki, David McKibbin and David
T. Yokozeki for Respondent.

WHITE, P. J.—This action was instituted by the Attorney General of the State of California upon the request of the Director of Agriculture for the purpose of enforcing the provisions of a certain "Marketing Order for California Bedding Plants," and certain ancillary orders promulgated pursuant thereto.

The California Marketing Act of 1937, chapter 10, division 6 of the Agricultural Code under which the instant orders were issued, was adopted in 1937 as a redraft and enlargement of the California Agricultural Act of 1935 (Stats. 1935, ch. 307, and the California Agricultural Agreement Act, Stats. 1935, ch. 677). Section 1300.10 of the Agricultural Code contains the legislative declarations as follows:

"[*Conditions adversely affecting agricultural producers.*] (a) It is hereby declared that the marketing of agricultural commodities in this State in excess of reasonable and normal market demands therefor; disorderly marketing of such commodities; improper preparation for market and lack of uniform grading and classification of agricultural commodities; unfair methods of competition in the marketing of such commodities; and the inability of individual producers to maintain present markets or to develop new or larger markets for California grown agricultural commodities, results in an unreasonable and unnecessary economic waste of the agricultural wealth of this State. Such conditions and the accompanying waste jeopardize the future continued production of adequate food supplies for the people of this and other States, and prevent agricultural producers from obtaining a fair return from their labor, their farms and the agricultural commodities which they produce. As a consequence, the purchasing power of such producers has been in the past, and may continue to be in the future, unless such conditions are remedied, low in relation to that of persons engaged in other gainful occupations within this State. Agricultural producers are thereby prevented from maintaining a proper standard of living and from contributing their fair share to the support of the necessary governmental and educational functions, thus tending to increase unfairly the tax burdens of other citizens of this State."

It is then stated that the foregoing conditions concern the health, peace, safety and general welfare of the people of this state and that the provisions of the aforesaid chapter 10 are enacted in the exercise of the police powers of the state for

the purpose of protecting the health, peace, safety and general welfare of the people of California.

The purposes of said chapter 10 are thus stated in section 1300.11 of the Agricultural Code:

"(a) To enable agricultural producers of this State, with the aid of the State, more effectively to correlate the marketing of their agricultural commodities with market demands therefor.

"(b) To establish orderly marketing of agricultural commodities.

"(c) To provide for uniform grading and proper preparation of agricultural commodities for market.

"(d) To provide methods and means for the maintenance of present markets or for the development of new or larger markets for agricultural commodities grown within this State or for the prevention, modification or elimination of trade barriers which obstruct the free flow of such agricultural commodities to market.

"(e) To eliminate or reduce economic waste in the marketing of agricultural commodities, and

"(f) To restore and maintain adequate purchasing power for the agricultural producers of this State."

Insofar as administration and enforcement of the act, administrative powers of the director and the authority to issue marketing orders are concerned, section 1300.13 provides that the Director of Agriculture, whenever he has reason to believe that the issuance of a marketing order or amendments to an existing one, will tend to effectuate the declared policy of the act with respect to any agricultural commodity, he may give due notice of, and an opportunity for, a public hearing upon a proposed marketing order or contemplated amendments to an existing one. The last mentioned section then prescribes the method for giving such notice ". . . to all producers or handlers of such agricultural commodity whose names and addresses appear upon lists of such persons, on file in the Department of Agriculture, who may be directly affected by the provisions of such proposed marketing order or such proposed amendments."

Section 1300.14 of the Agricultural Code provides that following the aforesaid hearing, the director must make findings respecting the proposed marketing order or amendments thereto, as follows:

"(1) That such provisions are necessary in order to effect a reasonable correlation of such supply of the agricultural

commodity affected with market demands therefor and that such marketing order or amendments thereto will tend to reestablish or maintain such level of prices for such agricultural commodity as will provide a purchasing power for such agricultural commodity which is adequate to maintain in the business of producing such agricultural commodity such number of producers as is required to provide such supply of the quantities and qualities of such agricultural commodity as is necessary to fulfill the normal requirements of consumers thereof.

"(2) That such marketing order or amendments thereto will tend to approach such equality of purchasing power at as rapid a rate as is feasible in view of the market demand for such commodity.

"(3) That such marketing order or amendments thereto are in conformity with the provisions of this chapter and within the applicable limitations and restrictions set forth therein and will tend to effectuate the declared purposes and policies of this chapter.

"(4) That such marketing order or amendments thereto will protect the interests of consumers of such commodity by exercising the powers of this chapter only to such extent as is necessary to establish the equality of purchasing power described in paragraph (1) of subsection (a) of this section."

The section last mentioned then provides that in making the aforesaid findings the director shall take into consideration all facts available to him with reference to certain economic factors.

Section 1300.16, in substance, provides that no marketing order or amendment thereto, affecting producers or producer marketing shall become effective until the director finds one or more of the following: "(A) That such marketing order or amendment thereto has been assented to in writing by not less than sixty-five per cent (65%) of the producers who are engaged, within the area specified in such marketing order or amendment thereto, in the production for market or engaged in such producer marketing, of not less than fifty-one per cent (51%) of the agricultural commodity specified therein in commercial quantities, or (B) that such marketing order or amendment thereto has been assented to in writing by producers who produce not less than sixty-five per cent (65%) of the volume of such agricultural commodity and by fifty-one per cent (51%) of the total number of producers so engaged, or (C) that such marketing order or amendment

thereto has been approved or favored by producers in a referendum among producers directly affected if the valid votes cast in such referendum in favor of such marketing order or amendment thereto represent not less than fifty-one per cent (51%) of the total number of producers of said commodity of record with the department who marketed not less than fifty-one per cent (51%) of the total quantity of said commodity marketed in the next preceding marketing season by said total number of producers of record with the department. Whenever any marketing order or any major amendment to any marketing order is issued by the director, he shall determine whether assent, approval, or favor thereto of the producers shall be by written assents or by referendum.''

The amended complaint herein alleges that, pursuant to and acting in accordance with the foregoing and other provisions of chapter 10, division 6 of the Agricultural Code, the director, on July 10, 1951, issued an order entitled ''Marketing Order for California Bedding Plants.'' That said order became effective July 18, 1951, and was in full force and effect at the time this action was commenced.

Pursuant to the foregoing Marketing Order for California Bedding Plants, the director, on August 14, 1951, issued an ''Order of the Director of Agriculture Establishing a Rate of Assessment for the Marketing Order for California Bedding Plants for the Marketing Season August 1, 1951, through July 31, 1952,'' hereinafter referred to as the ''Assessment Order.''

The original complaint herein was filed on July 8, 1952, predicated upon the aforementioned Marketing Order, Enforcement Order and Assessment Order. Respondent filed a demurrer to the complaint, which was sustained with leave to amend on November 20, 1952. Immediately thereafter, an ''Order of the Director of Agriculture Correcting the Record of the Order and Findings of the Director of Agriculture Making Effective the Marketing Order for California Bedding Plants,'' hereinafter referred to as the ''Amended Enforcement Order,'' was issued by the director on November 25, 1952, allegedly *nunc pro tunc* as of July 10, 1951, the date of the original Enforcement Order.

Shortly thereafter, a first amended complaint predicated on the aforementioned Marketing Order, Amended Enforcement Order, Assessment Order and Minimum Price Order was filed on December 5, 1952, to which an answer was filed on May 8, 1953.

When the cause was called for trial, the 17th cause of action was dismissed on motion of plaintiff. Defendant then moved for a dismissal of the remaining 16 causes of action on the ground that each failed to state facts sufficient to constitute a cause of action. This motion was granted and accordingly, judgment was entered in favor of defendant. From such judgment plaintiff prosecutes this appeal.

It appears that following the rendition of judgment and after an appeal was taken the Marketing Order for California Bedding Plants was amended. The ancillary order regarding sales was terminated, and a new and substantially different ancillary order regarding unfair trade practices has been promulgated. In appellant's brief it is stated "The State waives any claim to civil penalties by reason of defendant's sales below industry cost, and the questions presented by that portion of the complaint seeking enforcement of that ancillary order prohibiting sales below industry cost are now moot."

Appellant, however, asserts that this appeal is predicated upon the proposition that the Marketing Order for California Bedding Plants was a proper order under the California Marketing Act and that the assessments levied under the order were proper and valid assessments and should have been allowed by the trial court *regardless* of the validity or invalidity of the ancillary order *re* industry costs.

Appellant first contends that the California Marketing Act of 1937, chapter 10, division 6, of the Agricultural Code under which the instant orders were promulgated is constitutional. Neither in the trial court nor on appeal is any contention advanced that the legislation here in question is unconstitutional as an improper exercise of the police power of the state in violation of the due process clause of the federal Constitution, or that it impinges upon the guarantees of the state Constitution. The question of the constitutionality of legislative plans for the marketing of agricultural commodities was set at rest by the decisions in *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620 [91 P.2d 577]; *People* v. *Western Fruit Growers,* 22 Cal.2d 494 [140 P.2d 13]; *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal.2d 550 [55 P.2d 495]; *Dickey* v. *Raisin Proration Zone No. 1,* 24 Cal.2d 796 [151 P.2d 505, 157 A.L.R. 324].

The question presented to us is whether bedding plants are covered by the act and therefore, whether the Marketing Order for such plants is valid. It is the contention of respondent that bedding plants were not envisioned by the

act and that therefore, the Marketing Order is in excess of any authority conferred upon the Director of Agriculture by the act.

The Marketing Order for California Bedding Plants defines them as "all horticultural plants grown and sold by growers in bedding plant containers." In Webster's New Collegiate Dictionary is found a common and well-accepted definition of the term as follows: "—adj. Suitable for garden beds, esp. decorative beds; as, *bedding* plants;." And the Minimum Price Order issued by the director sets forth examples of bedding plants which are listed in seven groups. Listed as the first and last items in each group are the following bedding plants:

    I. African Daisy—Zinnia;
    II. Amaranthus—Viola;
    III. Calceolaria—St. Augustine Grass;
    IV. Agapanthus—Shasta Daisy;
    V. Anemone—Petunia;
    VI. Boxwood—Privet;
    VII. Dichondra (only listing in this group).

It would therefore appear that bedding plants are primarily the daisies, the petunias, and the violets, among others, which the producer grows in "flats" from seed, and which are cultivated by him in greenhouses or lathhouses. After the seeds have germinated, and the tender plants emerge, they are sold by the grower, generally to retail nurserymen, who in turn sell them, by the dozen plants or by the flat, to the ultimate consumers—the homemakers, who transplant them into their flower beds, in order that the plant may grow to flowering maturity and accomplish the so-called "home beautiful." Some of the bedding plants are vegetable, such as celery or tomato, which are sold by retailers for planting in the home garden.

The respondent is a wholesale nurseryman, a grower of bedding plants, and it is the marketing of such plants to retail nurserymen that the Marketing Order seeks to regulate.

There would appear to be considerable merit to respondent's claim that the act with which we are here concerned pertains to agricultural commodities having a food value, and to basic staples.

As pointed out by respondent, "In 1937, (when the Act was adopted) there still existed wide economic distress in the nation, agricultural prices were deflated, and farmers, the

producers of the nation's food, found themselves in a serious financial plight. It appears implicit from a reading of all of the provisions of the Act itself, and from all of the circumstances existing at the time of its enactment in 1937, that it pertains only to basic staples, e.g., cotton, and to agricultural commodities having a food value. Indeed, in section 1300.10 (a), Ag. C.A., the legislative declaration specifies the conditions adversely affecting agricultural producers, and states:

" 'Such conditions and the accompanying waste jeopardize the *future continued production of adequate food supplies* for the people of this and other States, and prevent agricultural producers from obtaining a fair return from their labor, their farms and the agricultural commodities which they produce.' (Emphasis added.)

"Section 1300.12(c), Ag.C.A., defines agricultural commodity:

" ' (c) "*Agricultural Commodity*" means any and all agricultural, horticultural, viticultural (including wine) and vegetable products produced in this State, either in their natural state or as processed by a producer for the purpose of marketing such product or by a processor as herein defined, and including bees and honey but not including timber or timber products.' "

In its broadest and technical sense undoubtedly, the term "horticulture" includes flowers and ornamental plants, but in view of the legislative declaration concerning "adequate food supplies," and having regard to the economic conditions existing at the time of the enactment of the act, it would seem doubtful that the Legislature intended the term to cover flowers and ornamental plants. ██ It is fundamental that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to *avoid absurdity or to prevent injustice.*

The legislative declaration contained in section 1300.10 of the Agricultural Code would seem to indicate that the primary concern of the lawmaking body was the maintenance of an adequate food supply essential to the needs of the people of the state. That the Legislature was concerned about luxury flowers for decorative and ornamental purposes would seem rather doubtful.

There is a further consideration that throws an element of doubt around the assumption that the Legislature intended that flowers and ornamental plants should be covered by the act, and that is, that it would have been a simple matter to have added the word "floriculture" to the other cultures specified. And interestingly enough, the lawmakers did finally include floriculture within the definition of agricultural commodities when by amendment of section 1300.12 (c) by Statutes of 1953, chapter 936, section 1, the phrase "including floricultural" was added after the word "horticultural." But the amendment came too late to aid appellant, because it was inoperative during the period covered by this litigation.

The main, and in our opinion, determinative issue on this appeal, however, is the contention advanced by respondent that the marketing of bedding plants is not affected with a public interest, and therefore, regulation of such marketing constituted an invalid exercise of the police power, and is violative of the due process clause of both the federal and state Constitutions.

Recognizing the limitations upon the exercise of the police power for regulatory purposes in that it may be invoked only where the commodity or service sought to be regulated is affected with a public interest and where such regulation is for the purpose of protecting the health, peace, safety and general welfare of the public, the Legislature expressly declared in section 1300.10 of the Agricultural Code that:

"(c) . . . The marketing of agricultural commodities within this State is hereby declared to be affected with a public interest. The provisions of this chapter are enacted in the exercise of the police powers of this State for the purpose of protecting the health, peace, safety and general welfare of the people of this State."

*But the mere declaration by a Legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground is justified.* The circumstances of its alleged change from the status of private business and its freedom from regulation into one in which the public have come to have an interest, are always a subject of judicial inquiry. As was said by our Supreme Court in *State Board* v. *Thrift-D-Lux Cleaners, Inc.,* 40 Cal.2d 436, 441 [254 P.2d 29]: "If a statute has no real or substantial relation to any legitimate police power objective, it is the duty of the court to so de-

clare," and again on page 440 it is held, " 'If there is a proper legislative purpose, a law enacted to carry out that purpose, if not arbitrary nor discriminatory, must be upheld by the courts.' (*In re Fuller* (1940), 15 Cal.2d 425, 428 [102 P.2d 321].)

"'However, in the exercise of the police power the law places limits on the discretion of the Legislature. Whether there has been a reasonable exercise of this power is a court question.''

Appellant relies strongly on the case of *Nebbia* v. *New York*, 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469], and argues that the "affected with a public interest" doctrine was completely abdicated in that case. The same contention was advanced in the case of *State Board* v. *Thrift-D-Lux Cleaners, supra,* and was rejected with the statement (p. 442) that, "On the contrary that case (*Nebbia* v. *New York*) may be cited merely for an interpretation of that doctrine. At page 536 the court stated that the phrase can mean 'no more than that an industry, for adequate reasons, is subject to control for the public good.' ''

Appellant urges that, "The bedding plant industry is a specialized, well developed, separate but integral and very essential part of the agricultural industry of the State," and further, "The growing and selling of bedding plants commercially is essential to the agriculture of the State of California for many reasons." Conceding, as urged by appellant, that some farmers buy bedding plants for certain of their crops, nevertheless, that the bedding plant industry is not "essential" would seem to follow from the fact that agriculture existed without suffering, prior to the development of a bedding plant industry. But assuming the correctness of appellant's contention as to the "essential" nature of the bedding plant industry, and that all farmers are dependent upon the industry in order to start their crops, we come to one of the provisions contained in article I, section A 4 of the Marketing Order which limits its coverage to bedding plants grown and sold "for resale." This comprehends only those bedding plants sold by the grower to the retailer for further sale to the consuming public. In no way does it impose any regulation whatsoever on bedding plants sold by the grower to a consumer, e.g., a farmer. As stated by respondent, "Therefore the farmer may buy from the grower for the purpose of planting, and the grower may sell to such farmer as many thousand flats of bedding plants as the farmer may

desire, and such marketing is completely exempt from the operation of the Marketing Order. Thus, the agriculture of the State is completely maintained by the 'essential' bedding plant industry, without the benefit of any assist whatsoever from the Marketing Order. In view of this circumstance, the argument of appellant that the Marketing Order is essential to the agriculture of the State totally collapses.''

Appellant further argues in support of the Marketing Order that without it ''there would be few gardens.'' In his memorandum ''Notice of Decision'' the trial judge answered appellant's contentions that ''gardens'' and ''beauty and lavishness'' are so essential to the ''general welfare'' that the bedding plant industry is thereby affected with the public interest, with this cogent comment:

''As a home gardener and a hobbying sort of naturalist, I yield to no one in my appreciation of all the loveliness and of the utility of flowers. I heartily agree with the very able counsel for plaintiff that man does not live by bread alone, but he can live by bread, without flowers, for a long time, as millions of people do.

''If the legislature can authorize a monopoly, with policing, assessments, price controls, production controls, and all the concomitants of monopoly, in the business of bedding flower plants, I see no limit to its power to destroy competition.''

There is a great similarity between the issues presented to the Supreme Court in the case of *State Board* v. *Thrift-D-Lux Cleaners, supra,* and those tendered to us on this appeal. Upon the authority of and for the reasons stated in that case, we are convinced that the Marketing Order was not issued in conformity with the California Marketing Act, and that, in promulgating it, the director exceeded his authority.

We find ourselves in further accord with the views expressed by the trial judge in his memorandum ''Notice of Decision,'' when he said: ''It is beyond my powers of comprehension to understand how in the business of growing and selling bedding flower plants (petunias, scabiosa, nierembergia, hollyhock, wallflower, African Daisy, etc.) the public health, morals, safety, peace or welfare can be served by destroying the incentive for a grower to reduce his costs below the average of the industry and to pass on to the home owner the benefit of that achievement.''

This decision is not to be understood as questioning the validity and constitutionality of the California Marketing

Act in its entirety. ▊ We simply hold that the Marketing Order for California Bedding Plants as applied to the facts pleaded in the instant case is invalid and in excess of the authority conferred upon the director by the act.

The foregoing conclusions at which we have arrived render unnecessary a discussion of or a decision upon other issues raised.

For the reasons herein stated, the judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied March 18, 1955, and appellant's petition for a hearing by the Supreme Court was denied April 20, 1955. Traynor, J., was of the opinion that the petition should be granted.