Filed 8/25/15

CERTIFIED FOR PUBLICATION

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DUARTE NURSERY, INC., | C071578 |
| Plaintiff and Appellant, | (Super. Ct. No. 00AS02731) |
| v. | |
| CALIFORNIA GRAPE ROOTSTOCK IMPROVEMENT COMMISSION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Raymond M. Cadei, Judge. Affirmed.

Law Offices of Brian C. Leighton and Brian C. Leighton; Law Offices of Brunn & Flynn and Gerald E. Brunn for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Randy L. Barrow, Supervising Deputy Attorney General, Linda Gandara, Deputy Attorney General, for Defendant and Respondent Karen Ross.

Kahn, Soares & Conway, George H. Soares and Ann M. Grottveit for Defendant and Respondent California Grape Rootstock Improvement Commission.

1

Plaintiff Duarte Nursery, Inc., sells grape rootstock, the part of grapevines that becomes the root system. (Food & Agr. Code, §§ 74718, 74725; undesignated statutory references are to this Code.) Plaintiff challenges mandatory assessments it must pay to the California Grape Rootstock Improvement Commission to help fund research for pest-resistant and drought-resistant rootstock. (§§ 74701-74796.) Plaintiff views this "Commission Law" and the Commission's operation as an unconstitutional exercise of the state's police power in violation of plaintiff's liberty interests and due process rights under the federal and state Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 1, 7.) In this appeal, plaintiff does *not* claim impairment of its rights to free speech or free association. Instead, plaintiff -- which has the wherewithal to conduct its own research for its own competitive advantage -- asserts a right to refuse to help fund research that benefits the industry as a whole.

Plaintiff sought injunctive and declaratory relief and refunds. After a bench trial, the trial court entered judgment in favor of defendants -- the Commission which administers the research program, and the Secretary of the California Department of Food and Agriculture (Secretary) who oversees the Commission. In an appeal long on innuendo and short on evidence, plaintiff insinuates that a self-interested university researcher and some of plaintiff's competitors used propaganda to dupe the Legislature and the grape rootstock industry into creating the Commission for the benefit of the researcher and plaintiff's competitors, rather than public benefit. We affirm the judgment.

OVERVIEW OF STATUTORY SCHEME

Under Division 22 of the Food and Agricultural Code (§§ 63901-78725), the Legislature may authorize establishment of commissions and councils to advance the state's interest in the success of the agricultural industry, which provides necessary food. (§ 63901.)

2

In 1992, after thousands of acres of California vineyards were destroyed by insects, the Legislature enacted the Grape Rootstock Improvement Commission Law (§§ 74701-74796; Stats. 1992, ch. 595, § 1 (Sen. Bill No. 1618)), which enabled rootstock nurseries to form a commission under the Secretary's supervision. "The production and marketing of grape rootstock produced in this state is hereby declared to be affected with a public interest. This chapter [chapter 12.6 of Part 2 of Division 22 of the Food and Agricultural Code] is enacted in the exercise of the police power of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state." (§ 74703.) "The production of grape rootstock constitutes an important industry of this state that not only provides substantial and necessary revenues for the state and employment for its citizens, but also furnishes essential food vital to the public health and welfare." (§74701.) "The maintenance of the grape rootstock industry of California is necessary to assure the consuming public of a continuous supply of good fruit for the table, raisins, and wine grapes, and establishes consistent and needed levels of income for those engaged in the industry." (§ 74702.) The Commission Law "shall be liberally construed. . . ." (§ 74705.) The Commission "is designed to provide those engaged in the production and marketing of grape rootstock the opportunity to avail themselves of the benefits of collective action in the broad field of grape rootstock research necessary to achieve the purposes stated herein." (§ 74707.)

Section 74771 stated the 1992 legislation would not become operative unless a referendum was held in which at least 40 percent of the total number of grapestock nurseries voted, and votes in favor of creating a commission were cast by either (a) 65 percent of voters, representing a majority of rootstock marketed by all voters, or (b) a majority of voters, representing at least 65 percent of rootstock marketed by all voters. (§ 74771.)

3

The referendum occurred in 1993, and the Commission was created and had its first meeting in January 1994. It has been renewed every five years by a vote of grape rootstock nurseries, as required by section 74795.

The Commission is composed of nine elected grape rootstock nursery owners or representatives, who serve three-year terms (§§ 74730, 74738, 74740, 74777), and the Secretary as an ex officio (nonvoting) member (§§ 50, 74715, 74730). The members may vote to dissolve the Commission. (§ 74796.) Commission members are not deemed to have personal financial interest in their decisions apart from the "public generally" (Gov. Code, §§ 87100, 87103) because the Commission serves the public interest, and the grape rootstock industry "is tantamount to, and constitutes, the public generally." (§ 74706.)

"The commission may conduct, and contract with others to conduct, production research, including the study, analysis, accumulation, and dissemination of information obtained from that research or otherwise, regarding this chapter." (§ 74761.) "The commission may accept contributions or matching private, state, or federal funds, and employ or make contribution of funds to other persons or state or federal agencies, for purposes of carrying out this chapter." (§ 74762.)

The Commission establishes, within statutory guidelines, an assessment rate on nurseries to defray operating costs. (§ 74764.) The initial annual assessment could not exceed $25 per rootstock-bearing acreage and one percent per invoicable unit of rootstock distributed or sold. (§§ 74719, 74785.) Thereafter, the assessment shall not exceed $50 per acre and two cents per invoicable unit, unless approved by referendum. (§ 74785.) Subsequent legislation narrowed the focus to rootstock used or distributed "for commercial purposes." (§ 74721; Stats. 1997, ch. 726, §§ 14, 14.5, 15 (Assem. Bill No. 1558).)

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff operates a grape rootstock nursery near Modesto in Stanislaus County, grafting rootstock and marketing it to grape growers and other nurseries. Plaintiff always did its own research, which included getting beneficial advice from the UCD viticulture department. Plaintiff saw no need for creation or continuation of the Commission. Plaintiff asserts it has been forced to pay assessments to the Commission totaling about $800,000 since the year 2000.

Unlike seasonal crops that can be rotated, grapevines have a lifespan of 25 to 50 years, making it important to breed rootstock that can resist insects, viruses, and nematodes (microscopic worm-like organisms).

In the late 1980's, when most California vineyards were using rootstock developed from European climates and soils, a microscopic aphid insect called phylloxera ravaged vineyards in Napa and Sonoma Counties, attacking a popular rootstock named AXR1 that had been used without a problem for decades and had been recommended by the viticulture department at the University of California at Davis (UCD). The failure of the vineyards affected over 50,000 acres in the Napa-Sonoma region, and required growers to replant at a cost of $30,000 to $50,000 per acre. This infestation cost the industry up to an estimated one billion dollars in costs to replant thousands of acres and lost revenue for the three years it takes for new vines to produce.

UCD had a research program for breeding pest-resistant rootstock, funded by various sources, including the California Table Grape Commission, and the California Raisin Advisory Board. The funding was insufficient, so nursery owners Richard Kunde of Sonoma Grapevines and Glen Stoller of Sunridge Nursery organized meetings seeking support for legislation authorizing creation of a rootstock commission. Dr. Andrew Walker, a UCD viticulture professor and researcher, helped stimulate creation of the

commission by giving presentations to groups about the need for rootstock breeding research.

As indicated, the legislation was enacted in 1992, and the Commission began operating in 1994.

In 1998, plaintiff filed a federal lawsuit claiming the assessments violated his rights to free speech and freedom of association, but the Ninth Circuit rejected the claim, stating in an unpublished disposition that the legislation addressed a need for the industry to operate in a collaborative manner both to serve the public interest and ensure its own economic health. (*Duarte Nursery, Inc. v. California Grape Rootstock Imp. Comm'n* (9th Cir. 1998) 166 F.3d 342, unpublished disposition.)

Plaintiff filed this lawsuit in state court in May 2000. The case was stayed by stipulation, pending resolution of unrelated appeals of free speech challenges to mandatory assessments in other agricultural programs.

In 2010, plaintiff filed its second amended complaint, alleging four counts. The first two counts alleged violation of the rights to free speech and free association but, pursuant to recent case law, the trial court granted summary adjudication in favor of defendants on those two counts, and plaintiff expressly states it does not challenge that ruling on appeal.

The remaining counts of the complaint alleged the Commission and its research program are an invalid exercise of the State's police power in that mandatory assessments are being used for an invalid purpose to fund plaintiff's competitors, in violation of plaintiff's due process rights and liberty interests. The pleading sought a declaratory judgment, a permanent injunction enjoining collection of assessments from plaintiff, a refund of assessments paid since 1996 (four years before the initial complaint was filed), and attorney fees as a private attorney general.

After the bench trial, the trial court rejected plaintiff's claims in a comprehensive statement of decision.

As to plaintiff's claim that there was no need for the legislation, the trial court found plaintiff's position unsupported by the evidence. Plaintiff's owners, James Duarte and his son John Duarte, both of whom have many years of experience in the grape rootstock industry, acknowledged the seriousness of the phylloxera crisis and its role in discussions leading up to the enactment of the Commission statutes. Although the Duartes apparently disagreed with the need for phylloxera research -- believing several resistant rootstock varieties already existed in the early 1990's, including plaintiff's own Freedom variety -- John Duarte acknowledged the supply of alternative varieties at that time was "very limited and the knowledge base was very limited." The trial court found this testimony did not refute the need for new funding sources for research. That plaintiff contributes to voluntary research programs reflects recognition of the need for and value of research.

The court found credible and persuasive the trial testimony of Richard Kunde, James Pratt, and Glen Stoller, all of whom had many years of experience in the grape rootstock industry, that lack of funding for research was one of the most significant issues facing the industry during the late 1980's and early 1990's, and was a significant factor leading to enactment of the Commission Law and establishment of the Commission. UCD's Dr. Walker noted breeding research was already underway and focused on nine major areas, including nematode resistance, fanleaf degeneration resistance, phylloxera resistance, fungal resistance, drought and salinity resistance, adaption to soil types, viticultural traits, understanding the biology of traits, and scion variety crosses. Dr. Walker said the annual cost of conducting breeding research at that time would be about $186,000, and he had been able to obtain only $77,000 from other sources. The court found this evidence indicated a real need for more funding sources.

The trial court found credible the testimony of defense witnesses that damage from phylloxera was particularly threatening because the industry primarily used rootstocks based on European varieties that were proving to be highly susceptible to phylloxera.

7

Dr. Walker "persuasively explained" that genetic research was desirable to avoid similar ravages in the future, and other grape-related research at that time was inadequate because it devoted only a relatively limited amount to rootstock research. Stoller and Pratt testified it was important to get the research started because development of new rootstock for breeding could take between 10 and 30 years.

Phylloxera was a significant factor but was not the only reason to fund research. Kunde and Dr. Walker testified about the need to research other diseases and pests, drought tolerance, and planting in poorer-quality soils as higher-quality soils were lost to development. Research in these areas has been done since the Commission was formed.

Based on this evidence, the trial court found the legislation was a reasonable and necessary exercise of the police power.

As to plaintiff's claim that the Commission does not advance any public interest but only private interests of Dr. Walker and plaintiff's competitors, the trial court found Dr. Walker's research program has consistently received the largest share of the Commission's research money, but it was disbursed for legitimate research projects, and the Secretary's supervision of the Commission provides a check against disbursements serving only private interests, and the court found credible Stoller's testimony that Dr. Walker was "the only person that was doing anything with rootstock breeding, and so he had a collection of materials that he had collected over the years, valuable stuff, that needed to be looked at and used in the breeding program, so he was the natural person to do it [research for the Commission]." Although plaintiff raised the issue of licensing fees or royalties that Dr. Walker may receive for rootstock developed through his research, plaintiff presented no evidence that Dr. Walker actually received any such payments or that it would be improper as a matter of law if he did.

The court also saw no evidence that the Commission operated to serve private interests of plaintiff's competitors as opposed to the industry as a whole. Dr. Walker's research has resulted in the development of new rootstock varieties available to all for

8

commercial use, though field-testing is not yet complete, and James Duarte admitted using a small amount of this new rootstock.

The trial court found the evidence did not support plaintiff's claim that Dr. Walker disparaged plaintiff's Freedom variety, thereby benefiting plaintiff's competitors. The court said Dr. Walker "credibly testified" he told growers that it was prudent not to recommend Freedom for the North Coast areas because Freedom has in its background vinifera, which was the source of the problem with AXR1 rootstock, and it is unknown how much vinifera poses a risk. Dr. Walker's lack of bias was apparent in that he has recommended Freedom for the sandier soils of the San Joaquin Valley, because of its resistance to nematode pressure. Seen in their full context, Dr. Walker's statements about the Freedom rootstock were not disparagement, but rather a cautiously-expressed scientific opinion about its suitability for use in certain areas in light of the phylloxera crisis.

The trial court found the evidence demonstrated the Commission and its operations are constitutionally valid. The court entered judgment in favor of defendants.

DISCUSSION

I. *Legal Standard*

Plaintiff says his constitutional claims are subject to heightened scrutiny rather than the rational basis standard urged by defendants. The trial court said enhanced scrutiny was appropriate but concluded plaintiff's claims fail under either standard. We explain rational basis is the proper legal standard because, with plaintiff having abandoned his free speech and free association claims, this case does not involve a *fundamental* right that would trigger enhanced scrutiny.

The State's police power is " 'the power of sovereignty or power to govern -- the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare.' . . . The police power extends to legislative objectives in

9

furtherance of public peace, safety, morals, health and welfare. . . . [¶] . . . [¶] A law is a valid exercise of the police power unless the law is manifestly unreasonable, arbitrary or capricious, and has no real or substantial relation to the public health, safety, morals or general welfare." (*Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 504 (*Massingill*) [statute requiring free water and compressed air at gas stations was reasonably related to public health and safety goal of safe operation of motor vehicles].) The law is presumed to be a valid exercise of the police power, and the challenger has the burden to establish the law does not reasonably relate to a legitimate governmental concern. (*Massingill, supra*, 102 Cal.App.4th at p. 504.)

" '[There] can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. [¶] So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*.' [Citation.]" (*Birkenfeld v. Berkeley* (1976) 17 Cal.3d 129, 155 (*Birkenfeld*), quoting *Nebbia v. New York* (1934) 291 U.S. 502, 537 [78 L.Ed. 940] [emergency was not a prerequisite for exercise of police power].) "In determining the validity of a legislative measure under the police power our sole concern is with whether the measure reasonably relates to a legitimate governmental purpose and '[we] must not confuse reasonableness in this context with wisdom.' [Citations.]" (*Birkenfeld, supra*, 17 Cal.3d at p. 159.)

"[T]he mere declaration by a Legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground

10

is justified." (*People v. Asamoto* (1955) 131 Cal.App.2d 22, 29-30, italics omitted.) "Although the existence of 'constitutional facts' upon which the validity of an enactment depends [citation] is presumed in the absence of any showing to the contrary [citations], their nonexistence can properly be established by proof. [Citations.]" (*Birkenfeld, supra*, 17 Cal.3d at p. 160; see also, *Amezcua v. City of Pomona* (1985) 170 Cal.App.3d 305, 310 [" 'A court is not concerned with the wisdom or policy of the law and cannot substitute its judgment for that of the legislative body if there is any reasonable justification for the latter's action' "].) Enhanced scrutiny applies if the right being violated is a fundamental right. "[T]he United States Supreme Court's substantive due process jurisprudence 'forbids the government to infringe certain "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.' [Citation.] Substantive due process analysis begins with a ' "careful description" of the asserted fundamental liberty interest.' [Citation.] This ' "careful description" ' must be concrete and particularized, rather than abstract and general. [Citation.]" (*In re Lira* (2014) 58 Cal.4th 573, 585, italics omitted.) If no fundamental right is at issue, the rational basis standard applies. (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 711 [no fundamental right to privacy applied to city's plan to fluoridate drinking water in the interest of public health].)

Here, plaintiff's complaint alleged, in separate counts, (a) violation of its due process rights under the California Constitution (art. I, § 7), and (b) violation of its liberty interest under the federal and state constitutional due process clauses (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7 [and § 1, listing liberty as an inalienable right, added by plaintiff on appeal]). The former count alleged plaintiff has a "fundamental civil right . . . to engage in [its own] scientific research and to refuse to fund the research of others . . . ." The later count alleged "fundamental civil rights . . . including the right to acquire, enjoy, own and dispose of property, the right to work, . . . the right to conduct lawful research, the right to learn, the right to trademark and patent inventions, the right

11

to legally sell legal products without anti-competitive interference with the State, . . . the right to make a lawful living off of one's work, ingenuity and investment," and free association rights plaintiff has abandoned on appeal. Plaintiff alleged its "liberty interests are violated to be compelled to fund said research, which is then used to broadcast to denigrate Plaintiff's own research product and own marketing" and to have plaintiff's money be used by "state employed researchers that develop varieties, patent those varieties, and then force Plaintiff to pay royalties for said varieties that are created, developed, bred, or otherwise improved with Plaintiff's compelled assessment dollars."

This leaves the asserted right "to refuse to fund the research of others" that might yield royalties for others and might hurt plaintiff by exposing flaws in plaintiff's products. Having abandoned his freedom of association claim, plaintiff offers no authority supporting a conclusion that this is a fundamental right (or even a liberty interest, for that matter). Under *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1 (*Gerawan II*), an asserted right not to contribute financially to *advertising* implicates free speech. (*Id*. at p. 22 [mandatory assessments on plum producers to fund generic commercial advertising did not violate federal Constitution and remand needed for application of intermediate scrutiny under state Constitution].) Even assuming this applied to *research*, plaintiff has expressly abandoned its free speech claim. In the absence of a free speech or free association claim, plaintiff's complaint does not implicate a fundamental right triggering stricter scrutiny.

On appeal, plaintiff mentions the right to privacy and cites a California case that was not a police power case (*White v. Davis* (1975) 13 Cal.3d 757 [taxpayer alleged police chief used public funds for illegal investigations]). The Commission notes plaintiff is a corporation and therefore has no privacy right under the California Constitution. (*Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1504.) It does not appear plaintiff asserted a privacy right in the trial court, and the passing reference on appeal is insufficient for us to address the matter. (*Ibid*.

12

[corporation's privacy claim under federal Constitution forfeited by failure to raise it in the trial court].)

We conclude plaintiff asserts no fundamental right, and the rational basis standard applies.

II. *Standard of Review*

The parties dispute the standard of review.

"The standard of review of constitutional questions is independent judgment, 'but with deference to underlying factual findings, which we review for substantial evidence, viewing the record in the light most favorable to the ruling [citations].' " (*People ex rel. Bill Lockyer v. Fremont Life Ins. Co*. (2002) 104 Cal.App.4th 508, 514.)

In some police power cases, the critical factual findings may be those of the Legislature rather than the trial court. But here the claim is that the Legislature was duped by false information provided by Dr. Walker and the nurseries who wanted the legislation. The only way plaintiff survived a motion for judgment, after it rested its case without calling any witnesses other than James Duarte and John Duarte, was that the trial court understood plaintiff was insinuating that Dr. Walker "conspired somehow in making false statements or misleading the legislature into thinking there was a problem, which there wasn't," "just so they could get money for research." The court described the theory as a "stretch" but something that could not be resolved in a motion for judgment. After hearing the defense witnesses, the trial court in its statement of decision repeatedly found that the evidence did not support plaintiff's claims and that the defense witnesses were credible.

As to these factual findings, we defer to the trial court which had the opportunity to observe the witnesses, but we otherwise apply de novo review.

13

III. *Objections to Statement of Decision*

Plaintiff argues we cannot infer findings from omissions or ambiguities in the trial court's statement of decision, because plaintiff filed objections to the statement of decision. (Code Civ. Proc., § 634.) Plaintiff's argument fails on multiple fronts, e.g., there was no omission or ambiguity in the statement of decision; we need not rely on inferences; and plaintiff's "objections" merely disagreed with the trial court.

Code of Civil Procedure section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." The statute applies only when there is an omission or ambiguity in the trial court's decision, not when the party attacks the legal premises or claims the trial court's findings are irrelevant or unsupported by evidence. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 558.)

A court's statement of decision need not respond to every point raised by a party or make an express finding of fact on each contested factual matter; it need only dispose of all basic issues and fairly disclose the court's determination as to ultimate facts and material issues in the case. (*Pannu v. Land Rover North America* (2011) 191 Cal.App.4th 1298, 1314, fn. 12.)

Plaintiff presented 11 objections to the statement of decision, none of which were proper statutory objections.

Most of these objections -- objections one through four, six, seven, 10, and 11 -- simply disagreed with the trial court's findings, e.g., that plaintiff produced no evidence the legislation lacked a factual basis or served private interests, that defense witnesses were credible, that the Duartes admitted the crisis, that Dr. Walker expressed reservations about Freedom rootstock not to disparage plaintiff but to express legitimate concerns.

14

The objections argued the trial court "omitted" crucial "facts" -- that the phylloxera crisis was already resolved before the 1992 legislation, and that Dr. Walker did not care about phylloxera. We address these two points *post*, but they were not a proper basis of objection under Code of Civil Procedure section 634.

Objection number five claimed the court made an irrelevant statement that documentary evidence showed Commission grants for research for nematode resistance. Plaintiff claimed activity did not prove necessity, and the research has not yielded anything of commercial benefit. Plaintiff characterized the court's statement as adopting an illegitimate test for government control over business. However, the trial court did not purport to be defining a test for the exercise of police powers. The court merely said the documentary evidence supported the testimony that phylloxera was not the only issue motivating creation of the Commission, and research had been conducted on the other issues. This was not a proper statutory objection.

Objection number eight attacked the court's statements that plaintiff did not show the pre-Commission funding levels were sufficient to meet the other industry challenges, and plaintiff's admission that it voluntarily contributes to other rootstock research programs suggested plaintiff recognizes the need for and value of rootstock research. Plaintiff asserted voluntary contributions did not admit a need for mandatory assessments, and the statements were irrelevant to the question whether there was a need for the legislation. This was not a proper statutory objection.

Objection number nine claimed the trial court, by saying the industry needed more money for research, applied a rational basis test despite having concluded a more stringent test applies. Not so. The challenged statements were the court's response to plaintiff's arguments that the existence of pre-Commission research rendered the Commission unnecessary, and that the Commission mainly served private interests.

We conclude plaintiff made no valid objection to the statement of decision under Code of Civil Procedure section 634.

15

IV. *Reasonable Relation to Legitimate Purpose*

Plaintiff argues there was no public "necessity" for enactment of the Commission Law in 1992, because the industry was already conducting its own research; the phylloxera crisis was over; and "[e]verything was fine." As we have explained, the standard is that the legislation be reasonably related to a legitimate public purpose, and we conclude it was.

The public purposes cited by the Legislature were the maintenance of a continuous supply of fruit vital to the public health and welfare and the economic health of the industry. (§§ 74701-74703.) The legislation enabling industry members to join for collaborative action to conduct research is reasonably related to this legitimate public purpose. The Legislature regards agriculture to be the state's most vital industry. (*Hess Collection Winery v. Agricultural Labor Relations Bd*. (2006) 140 Cal.App.4th 1584, 1603.)

Plaintiff claims the absence of any need for the legislation appears in section 74702.5, which states: "The successes that the grape rootstock industry has enjoyed have come in part through a commitment to industry funded research, which has led to significant improvements in the quality and variety of the grapes and grape products available to consumers. The establishment of the commission is intended to enhance this research effort and move the grape rootstock industry toward its potential, resulting in increased consumer value and enhanced grower returns." This statute was not enacted with the 1992 Commission Law but was part of 1995 periodic review of agricultural commissions. (Stats. 1995, ch. 727, § 49.3 (Assem. Bill No. 1563); Assem. Com. on Appropriations, Analysis of Assem. Bill No. 1563 (1995-1996 Reg. Sess.) as amended May 3, 1995, p. 1.)

According to plaintiff, this statute "on its face, confirms that the Commission and its assessments are simply unnecessary additions to government bureaucracy" and

16

disproves the "lobbyist-written legislative pronouncements" of public interest. Not so. The legislation recognizes the long game. Additionally, though plaintiff claims necessity "cannot be found in the legislation itself," the legitimate public purpose can be found in section 74702 ("maintenance of the grape rootstock industry of California is necessary to assure the consuming public of a continuous supply of good fruit . . . and needed levels of income for those engaged in the industry") and section 74707 (Commission "provide[s] those engaged in the production and marketing of grape rootstock the opportunity to avail themselves of the benefits of collective action in the broad field of grape rootstock research necessary to achieve the purposes stated herein"). Additional support is found in section 63901, which was part of the 1995 legislation and added to Division 22 of the Code, the Division which includes the Rootstock Commission. Section 63901 provides the commissions:

"(b) Reflect a continuing commitment by the State of California to its agricultural and seafood industries that are integral to its economy. These industries are a source of substantial employment for the state's citizens, produce needed tax revenues for the support of state and local government, encourage responsible stewardship of valuable land and marine resources, and produce substantial necessary food and fiber for the state, nation, and world.

"(c) Represent a policy of support for persons engaged in the agricultural and seafood industries, which are critically important elements of the state's economy. These commissions and councils are particularly important for the continued success of California's unique agricultural and seafood industries which tend to be decentralized with many small entities operating in diverse locations.

"(d) Provide benefit to the entire industry and all of the people of this state. The commissions and councils are not enacted, and are not intended to produce measurable benefit, on an individual basis, and their successes should be evaluated by

17

analyzing the extent to which they have improved the overall conditions for the particular commodity subject to the commission's or council's jurisdiction with resulting benefit to the overall economy of the state.

"(e) Enhance the image of California agricultural and seafood products to increase the overall demand for these commodities. In this fashion, the Legislature intends that the commissions and councils operate primarily for the purpose of creating a more receptive environment for the commodity and for the individual efforts of those persons in the industry, and thereby compliment individual, targeted, and specific activities." (§ 63901.)

Even assuming for the sake of argument that California has been the number one producer of rootstock in the country, as asserted by plaintiff, that does not detract from the legitimate public purpose of the legislation.

A recurring theme in plaintiff's case is that there was no need for the 1992 Commission Law because the phylloxera crisis was already over. Plaintiff cites a 1953 case that spoke of whether there was an emergency necessitating legislation. (*State Board of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc*. (1953) 40 Cal.2d 436, 441.) However, an emergency is no longer a prerequisite for the exercise of police power. (*Birkenfeld, supra*, 17 Cal.3d at pp. 155-159, quoting *Nebbia v. New York*[, *supra*,] 291 U.S. [at p.] 537 [78 L.Ed. 940].)

Plaintiff acknowledges emergency is not a prerequisite but claims *Birkenfeld, supra*, 17 Cal.3d at p. 160, requires "actual existence" of a public problem. However, the cited passage stated the constitutionality of rent controls under the police power to address landlords charging exorbitant rents during a housing shortage depended on the actual existence of the housing shortage and rent inflation which was the city's stated purpose for the law. (*Ibid*.)

18

Here, the stated purpose of the Commission Law was not resolution of an active emergency, but maintenance of the industry for the protection of the public welfare which depends on the grape rootstock industry for essential food vital to the public health and welfare.  (§§ 74701-74703.)

Plaintiff says, "The Commission has not developed anything useful to Duarte Nursery."  However, Mr. Duarte's testimony to that effect was a conclusion rather than a factual statement and was belied by evidence that plaintiff is using small amounts of rootstock developed through Commission research.  Moreover, the assertion is irrelevant, because section 63901, enacted in 1995, expressly states the Commission is not intended to benefit individuals:  "The Legislature hereby finds and declares that the commissions and councils established pursuant to this division [Division 22, Marketing Advisory and Promotional Agency Laws, including Part 2, ch. 12.6, §§ 74701-74796, the Rootstock Commission] advance the interests of the State of California, in that they do all of the following:  . . . [¶]  (c)  Are intended to provide benefit to the entire industry and all of the people of this state.  The commissions and councils *are not enacted, and are not intended to produce measurable benefit, on an individual basis*, and their successes should be evaluated accordingly by analyzing the extent to which the commissions and councils have improve the overall conditions for the particular commodity subject to the commission's or council's jurisdiction."  (§ 63901, italics added; Stats. 1995, ch. 727, § 1, pp. 5405-5406.)

In apparent furtherance of its conspiracy claim, plaintiff asserts Dr. Walker used the phylloxera crisis as a pretext to push for creation of the Commission in order to further his own self-interest in winning research grants for himself.  Or, as plaintiff puts it, Dr. Walker "fomented a frenzy" about a phylloxera crisis and then spent none of the money even attempting to develop a phylloxera-resistant variety, which he admitted was not necessary.  Plaintiff claims the Commission-funded research has not accomplished

19

anything, and Dr. Walker admitted he was not even trying to come up with phylloxera-resistant rootstock.

However, plaintiff forfeits these substantial evidence claims by failing to acknowledge evidence favorable to the judgment. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [appellant is required to set forth in appellate brief all material evidence on the point and not merely appellant's own evidence].) Moreover, substantial evidence supports the trial court's rejection of plaintiff's claims.

Dr. Walker, testifying about the need for research funds, said, "I wouldn't say really it [the phylloxera problem] was a crisis. The crisis was in the knowledge. So we weren't quite sure what rootstocks to use to replace it, which stimulated the need for a better rootstock evaluation and trials. [¶] We weren't quite -- as a geneticist I wasn't quite sure what had happened and I wanted to learn more about the diversity of the pest and the aggressive forms of the pest. [¶] It was a crisis from an industry perspective, certainly, because they were losing a lot of money and they had to replant those vineyards."

Dr. Walker testified he provides regular reports to the Commission and released five new varieties of rootstock in 2008 as a result of the research program. When plaintiff's counsel asked Walker, "[d]idn't you say that you're not actually attempting to breed a variety to be phylloxera resistant," Walker said, "One of its characteristics should be phylloxera resistance," but "It's not specifically what I'm looking for." Since he started getting funding from the Commission around 1994, Walker has not developed any variety completely resistant to phylloxera, but the best would be GRN1, which he released in 2008, and "we are hoping has closer to what I guess you would call immunity or extremely high resistance to phylloxera." Laboratory tests showed extremely high resistance, and at the time of trial, it was undergoing field trials in areas known for high phylloxera, but it was too early to tell. These evaluations took a long time; researchers

still evaluate rootstock bred a hundred years ago for adaptation to specific sites, which is the most important component of rootstock evaluation.

Dr. Walker testified he has since compiled a large collection of phylloxera from across the nation to study the range of genetic types and changes, and to study the genetic basis of rootstock to see why some varieties are resistant and others are not. The point of the research is "[t]o avoid AXR1-like scenarios in the future, so we have the highest . . . possible adaption of phylloxera to rootstocks, even ones we consider resistant, to better guide the viticultural community in terms of the best sources of resistance and the risks they might take in using certain rootstocks . . . ." Walker had known AXR1 failed in other countries but had success in California, though perhaps due to absence of the insect rather than resistance to it.

Dr. Walker testified he helped "stimulate," i.e., "promote," creation of the Commission, by "giv[ing] presentations to groups. I tried to convince people of the need to look at rootstocks more broadly, not just phylloxera, but nematode pressure, drought, salinity, other issues." "By the time I was hired [in 1989] I was giving talks about the need for rootstock breeding and promoting that aspect of it." At trial, he said he still gives such talks frequently.

Dr. Walker acknowledged UCD and the State were not going to give him money for research, so he had to find other sources. Meetings to discuss creation of the Commission were organized by nurseries, not Walker. He remembers attending one of the meetings, at Parlier. Walker did not meet with any legislators regarding this Commission Law. The organizers told him when the Commission was moving forward. He was writing reports about rootstock breeding on a regular basis to other funding sources. When asked if he did anything else to stimulate formation of the commission beyond attending one meeting, Walker said, "No. The vast majority of my public speaking efforts go to the industry at large, and the rootstock nurseries have never really

met on a formal basis to be spoken to. They may have been in the audience of those other meetings."

Plaintiff's counsel, in cross-examining Walker, insinuated Walker fabricated discovery of a new phylloxera strain to scare the industry into creating the Commission, but Walker testified he was not the one who made that discovery.

UCD and Dr. Walker would get a share of royalties on new rootstock releases developed by UCD research, but Walker had not received any at the time of trial and did not expect any in the near future because it will take time to complete field trials. Plaintiff offers no legal authority that there is anything wrong with this.

Plaintiff tries to twist Dr. Walker's reservations about plaintiff's Freedom rootstock into unfair disparagement. Again, plaintiff forfeits this substantial evidence issue by failing to acknowledge evidence favorable to the judgment. Dr. Walker *recommended* Freedom rootstock for certain soils. And the trial court, which had the opportunity to observe Dr. Walker's demeanor during his testimony, found Walker's reservations about using Freedom in other soils was motivated by the legitimate concern of an expert, not malice.

We conclude the Commission Law is constitutionally valid, and the evidence does not support plaintiff's conspiracy claims.

V. *Delegation to Nursery Owners Does Not Invalidate Commission Law*

Finally, plaintiff argues there was no proper exercise of the state's police power, because the Legislature left it up to private rootstock nurseries, which number fewer than 50, to implement the law. However, plaintiff fails to acknowledge, as stated by the trial court, that *Gerawan II, supra*, 33 Cal.4th 1, said, "partial delegation of authority for the creation of generic advertising programs to agricultural producers does not by itself constitutionally invalidate such programs." (*Id*. at p. 26.) By analogy, the same applies to research programs. Moreover, the statutes give the Secretary, a public official, the

22

duty and authority to oversee the Commission and to "require the commission to correct or cease any activity or function which is determined by the [Secretary] not to be in the public interest or which is in violation of this chapter." (§§ 50, 74731.)

Plaintiff cites case law for the proposition that a delegation of legislative authority on those directly interested in regulation may be improper if there is no legislative guide for the exercise of the delegated authority. (*Davis v. Municipal Court* (1988) 46 Cal.3d 64, 93-94; *State Board of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc., supra*, 40 Cal.2d at p. 448.) Here, however, the statutes guide the exercise of authority, giving the Secretary the power and obligation to oversee the Commission and to order the Commission to cease or correct any acts not in the public interest (§ 74731), and the statutes even go so far as to set the maximum assessment rates and require industry approval to exceed that rate (§ 74785).

Plaintiff cites *Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, a case involving unmodifiable contracts with taxi drivers, where the court said a government entity may not validly contract away its right to exercise the police power in the future. (*Id*. at pp. 1557-1558.) But plaintiff fails to show any such contract in this case.

We conclude the Commission Law is valid.

23

The judgment is affirmed.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278.)


      HULL       , J.


We concur:


      BLEASE     , Acting P. J.


      NICHOLSON   , J.