Filed 1/9/25  Simmons v. Gilmore Partners CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANTOINETTE SIMMONS, | B328466 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. 19STCV46894) |
| v. | |
| GILMORE PARTNERS, LP, | |
| Defendant, Cross-complainant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Affirmed.

Law Offices of Noel Weiss and Noel Weiss for Plaintiff, Cross-defendant and Appellant.

Burgee & Abramoff and John G. Burgee for Defendant, Cross-complainant and Respondent.

_____

Antoinette Simmons appeals a judgment awarding her landlord Gilmore Partners, LP (Gilmore) damages of $13,663.53 on its cross-complaint to collect unpaid rent. Simmons contends the trial court applied the incorrect measure of damages and erred by not crediting her claimed offsets for uninhabitability of her apartment and for Gilmore's failure to mitigate damages. Finding no merit in her arguments, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

### A. The Rent Dispute

In February of 2006, Simmons signed a one-year lease to occupy Apartment 221 at a building owned by Gilmore in North Hollywood, California. When Simmons's lease expired, she continued to occupy her apartment as a month-to-month tenant. At the beginning of 2019, Gilmore's management company surveyed rents charged at comparable buildings in the area, and suggested a 10 percent rent increase. Simmons's monthly rent at that time was $1400, plus a $3.61 "code enforcement fee" imposed by the City of Los Angeles.

On January 30, 2019, Gilmore announced it would increase the rent on month-to-month tenants in Simmons's building. Effective April 1, Simmons's monthly rent was to increase by $135, for a total of $1538.61 (including the $3.61 code enforcement fee). In January, February and March of 2019 Simmons paid her base rent of $1400 but not the $3.61 code enforcement surcharge. In April, the first month affected by the increase, she paid $1407.22, and in May she paid $1400. Gilmore's policy was not to take enforcement action against tenants who underpaid their rent by a small amount. Instead, it will "give the tenant a month or two to pay and handle[] the shortfall by talking to the tenant."

2

In May of 2019 Gilmore announced a further rent increase, to take effect later that summer.  This time, Simmons and a group of her fellow tenants responded with a rent strike.  Simmons paid no rent in June.  In July she paid $1400.00 rent which was the last payment Gilmore accepted.

On August 9, 2019, Gilmore announced it was rescinding the second rent increase.  The notice informed Simmons that her monthly rent "will return to the previous rate of $1538.61" and gave her until August 12 to pay her outstanding rent.  When Simmons did not pay, Gilmore's manager posted a three-day notice to pay or quit on August 12.  It withdrew that notice and posted a second notice on September 19, 2019.  That notice, too, was withdrawn.  On October 14, Gilmore posted a third notice to pay or quit, along with a letter showing the dates and amounts of Simmons's missed rent payments.  In response, Simmons tendered a check for a lesser sum, which Gilmore refused.  Thereafter, on October 28, 2019, Gilmore sent a fourth notice to pay or quit as well as a letter offering to delay the effective date of the 2019 rent increase until August 1, provided Simmons pay the outstanding rent for June, August, September and October.  Simmons did not comply.  Simmons tendered $1400 rent payments in November and December of 2019, and in January of 2020, all of which Gilmore rejected.  Simmons made no further tenders of rent after January 2020.

**B. Habitability Issues**

Concurrently with the dispute over rent, Simmons was raising concerns about maintenance at her apartment, as well as concerns about a roach infestation.  On July 23, 2019, she forwarded a list of seven "repairs and services" for her apartment, including  "pest control services," repairing broken

drawers in her kitchen cabinets, and replacing worn carpeting in the apartment. In response to her requests, Gilmore's on-site maintenance man performed some repairs. Simmons received a new air conditioner. A general contractor replaced the hot and cold water faucets in her shower with a new control unit. A city inspector visited Simmons's apartment in July of 2019. The inspector noted some items needing correction, which Gilmore completed before re-inspection the next month. In October a city inspector ordered Gilmore to replace the drawers in Simmons's kitchen. Gilmore hired a general contractor, who completed the repairs. Gilmore's unit passed its re-inspection.

Gilmore also attempted to address Simmons's concerns about pests. Gilmore had a pest control company perform regular treatments at Simmons's building. Although tenants were notified from one to several days in advance when treatments would occur, Simmons would not always make her unit available for treatment. For example, on one occasion Simmons refused access to her apartment, and on another access to her bedroom. On still other occasions treatment was incomplete because of "heavy clutter" in the apartment, or because Simmons had not cleared her possessions from the kitchen counter and stove.

### C. Simmons's Complaint and Gilmore's Cross-Complaint

On December 20, 2019, Gilmore filed an unlawful detainer action against Simmons asking for an award of past due rent, attorney fees, and forfeiture of Simmons's tenancy. That action never came to trial and was ultimately dismissed in 2020.[1]

---

[1] According to Gilmore, the unlawful detainer action never came to trial "due to the Covid pandemic" and "was dismissed without prejudice on September 10, 2020."

On December 31, 2019, Simmons filed a verified complaint against Gilmore, its general partner Millennium Holdings, Inc. and Lucille Hotnog, the CEO of Millennium Holdings, Inc., alleging seven causes of action labeled unlawful business practice, unfair business practice, fraudulent business practice, breach of the covenant of good faith and fair dealing, breach of the warranty of habitability, private nuisance and negligence. The first five causes of action were against Gilmore only, while the claims for private nuisance and negligence were against all defendants. The gravamen of her causes of action was that Gilmore failed to maintain her apartment in habitable condition, failed to make repairs when needed, and failed to abate a cockroach infestation affecting Simmons's apartment, all in order to drive Simmons from her apartment in order to rent it to a new tenant at higher rent than Simmons was paying. Simmons sought general damages, punitive damages against all defendants, attorney's fees, and restitution from Gilmore "of all sums obtained by said defendant as a result of its wrongful conduct and that of its agents, employees, and officers."

On May 17, 2021, Gilmore filed a cross-complaint against Simmons, alleging causes of action for breach of contract and a common count of using Gilmore's property without paying rent. Gilmore demanded damages of $20,000. Two significant events occurred before trial. First, Simmons vacated her apartment on or about September 5, 2020, although there is some ambiguity about when Gilmore was notified Simmons had moved out.[2]

---

[2] Although Gilmore contended that Simmons's counsel only provided notice to Gilmore on October 7, 2020, the court's Statement of Decision observed that "by happenstance, the

5

Second, Gilmore applied for, and received, a Covid relief payment from the State of California in the amount of $12,057.16, representing unpaid rent on Simmons's apartment for the period April through November, 2020.

### D. Trial and Judgment

A bench trial on Simmons's complaint and Gilmore's cross-complaint began in June of 2022.[3]  Simmons testified in support of her claims and introduced photographs and other exhibits supporting her contention that the apartment was uninhabitable during much of 2019 and 2020.  Gilmore presented testimony by a representative of its management company, an on-site maintenance man, the general contractor who performed repairs in Simmons's apartment in 2019, and the owner of the pest control company that treated Simmons's apartment building in 2019.

Following the close of evidence, the parties submitted post-trial briefs.  Simmons argued that Gilmore had terminated her tenancy when it first served a three-day notice to pay rent or quit, and thereby waived its right to collect more than the fair rental value of the apartment, which she contended was diminished by the defects making it uninhabitable.  She also argued that Gilmore had accepted her checks for less than the amount of rent it claimed was owed.  Finally, she argued that her evidence proved she was entitled to damages as well as offsets

---

manager . . . saw Plaintiff moving [on September 5, 2020] and Ms. Simmons told her she was leaving."

[3]     The trial was not reported.  In lieu of a reporter's transcript, counsel prepared and signed a daily "settled statement" summarizing that day's testimony.

against the damages claimed by Gilmore. For its part, Gilmore insisted Simmons's month-to-month tenancy was never terminated and that her apartment was habitable at all times. Taking into account the Covid relief payment it received from the State of California, Gilmore calculated the amount of unpaid rent as $13,663.53.

On December 15, 2022, the court issued its statement of decision, finding in the defendants' favor on all of Simmons's causes of action, and in Gilmore's favor on its cross-complaint. The trial court rejected Simmons's contention that Gilmore's three-day notices terminated Simmons's tenancy, concluding instead that the month-to-month tenancy remained in effect until Simmons vacated her apartment, and that the appropriate measure of damages was the monthly rent charged by Gilmore rather than Simmons's estimated "fair rental value." The court also rejected Simmons's claim that her apartment was not habitable, finding that Gilmore "presented business records and credible testimony that showed Ms. Simmons['s] complaints were grossly exaggerated" and that Simmons "has not shown that she was denied full use of her apartment such that she is entitled to restitution for any amount of time." Applying the contract measure of damages for the months when Simmons did not pay rent, and deducting the amount Gilmore received in Covid relief, the court awarded Gilmore damages in the amount of $13,663.53. The court entered judgment on January 24, 2023, and Simmons filed a timely notice of appeal.

## DISCUSSION

Simmons makes three contentions on appeal. First, she argues that we must reverse the trial court because its statement of decision does not address all the issues raised at trial. Second,

7

she contends the trial court improperly based its damage award on the "contract" rent for Simmons's apartment rather than on its fair market value. Finally, she argues the trial court erred by not reducing Gilmore's damage award by her so-called "remediation" and "mitigation" offsets.

### A. Standard of Review

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.]" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).) Provided the " 'statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' [Citation.]" (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

### B. The Statement of Decision was Adequate

Simmons argues the judgment must be reversed because the trial court's statement of decision did not adequately address contested issues. We disagree: the trial court's statement of decision addressed all the issues Simmons raised in her request for that statement. "[C]ourts must issue a statement of decision ' "explaining the factual and legal basis for its decision" ' only *if* a party makes a timely request, and must address in that

statement only the ' "controverted issues" ' a party 'specif[ies]' in the request. [Citation.]" (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1115.) Simmons requested a statement of decision in her first post-trial brief filed on July 18, 2022, listing three "core issues of fact" and four "core issues of law" that she wanted the court to address.[4] Our review is limited to whether the statement of decision addressed the issues Simmons raised: "omissions or ambiguities in the statement of decision . . . are germane only as to issues framed as materially controverted under [Code of Civil Procedure] section 632." (*Thompson, supra,* 6 Cal.App.5th at p. 982.)

"A court's statement of decision . . . need only dispose of all basic issues and fairly disclose the court's determination as to ultimate facts and material issues in the case. [Citation.]" (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1012.) Here, the statement of decision addressed the material issues raised by Simmons's complaint and Gilmore's cross-complaint, including the issues of law and fact raised by Simmons. Simmons's objections to the statement merely take issue with the court's weighing of evidence

---

[4] The "core issues of fact" Simmons identified were (1) the date Gilmore terminated Simmons's month-to-month tenancy; (2) the reasonable rental value of Simmons's apartment as of August, 2019; and (3) Simmons's damages. The "core issues of law" she identified were (1) the legal relationship between Simmons and Gilmore; (2) whether the January 2019 rent increase remained in effect after Gilmore rescinded the second rent increase; (3) whether Gilmore is limited to claiming the fair market value of Simmons's apartment in damages; and (4) whether Simmons's month-to-month tenancy remained in effect until she vacated the apartment.

and its application of fact to law.  "Objections" of this character do not go to the sufficiency of the statement of decision, and do not affect our review of the trial court's findings of fact.  (*Id.* at p. 1012 [objections that "simply disagreed with the trial court's findings . . . were not a proper basis of objection under Code of Civil Procedure section 634"]; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 558 [same].)

## C. The Trial Court Applied the Correct Measure of Damages

A tenant who remains in possession after the landlord terminates a lease or tenancy is no longer liable for rent, but rather for the reasonable value of the premises.  (*Lehr v. Crosby* (1981) 123 Cal.App.3d Supp. 1, 9.)  According to Simmons, Gilmore terminated her month-to-month tenancy effective August 12, 2019, when it posted the first of four three-day notices to pay rent or quit.  She relies on this language in the August 12 notice:[5] "if you fail to perform or otherwise comply, Owner/Agent does hereby elect to declare the forfeiture of your Rental Agreement under which you hold possession of the above-described premises."

The trial court determined that Gilmore's three-day notices did not terminate Simmons's tenancy.  It pointed to facts showing neither party treated the tenancy as ended.  Simmons continued to occupy the apartment until at least September of 2020, and she testified "she was planning to move depending on the outcome of the court action" and she believed "the rent issue" would be resolved by the court or by a settlement.  Gilmore specifically referred to Simmons's "tenancy" in a second notice of

---

[5]     The notice dated September 9, 2019, does not contain this language.

10

rent decrease dated December 26, 2019,[6] long after the fourth pay-or-quit notice was posted. Moreover, all four notices made clear that termination of Simmons's tenancy was reserved for a subsequent action: each states, in substance, that in the event Simmons does not pay or quit, "legal proceedings will be instituted against you to declare the forfeiture of the lease or rental agreement under which you occupy" the apartment. We agree with the trial court that neither side treated the notices themselves as terminating Simmons's tenancy.[7]

Simmons next argues that Gilmore terminated her tenancy when it included in its unlawful detainer complaint filed on December 20, 2019, a request that the court declare her lease forfeited. Again, we disagree. As Simmons acknowledges,

---

[6] The December 26, 2019 notice decreased Simmons's rent from $1538.61 to $1519.81 and, according to Gilmore, was sent in compliance with a recent change in law.

[7] Even if Simmons is correct that Gilmore was limited to recovering the fair market value of Simmons's apartment beginning in August of 2019, nothing in the record sets $1400 per month as the market price. Gilmore raised rents in 2019 based on a survey showing other landlords charged more rent for comparable units. New tenants in Simmons's building – those signing one-year leases – were paying more than $1538 per month for apartments similar to Simmons's. Simmons testified she was unable to find a comparable apartment that did not cost at least $500 more per month than what Gilmore was charging. Simmons's apartment rented for $1750 per month after she moved out. Whether measured by the actual rent charged or by the "market rate," the trial court's award of damages was not excessive.

Gilmore's unlawful detainer action was never prosecuted, much less adjudicated in Gilmore's favor. In fact, Gilmore contended below that the unlawful detainer action was dismissed on September 10, 2020, more than seven months before Gilmore filed its cross-complaint in this action. Simmons cites no authority, and we are not aware of any, that the mere act of filing an unlawful detainer action seeking forfeiture of the lease bars a landlord from a later action to collect rent at the contract rate.

Simmons's third contention is that Gilmore waived its right to collect contract rent by accepting Simmons's checks for less than $1538.61 following the April 1 effective date of the rent increase. The trial court rejected this argument, pointing to language in Simmons's original lease providing that "acceptance of rent with knowledge of any default by Renter shall not be deemed a waiver of such default, nor limit Owner's rights with respect to that or any subsequent default."[8] Although her lease had long since expired, Simmons remained bound by its "essential terms" during her subsequent month-to-month tenancy. (*Smyth v. Berman* (2019) 31 Cal.App.5th 183, 192; Civ. Code, § 1945 [where a lessee remains in possession after the lease term ends, the parties are presumed to have entered into a tenancy at sufferance "on the same terms and for the same time, not exceeding one month when the rent is payable monthly, nor in any case one year"].) The " ' "essential" ' terms" that carry over from the expired lease include the " ' "amount and time of payment of rent." ' " (*Smyth v. Berman*, at p. 192.) The testimony of Gilmore's manager confirms that Gilmore did not

---

[8]    The lease was admitted in evidence at trial but is not included in the record on appeal.

waive its remedies for Simmons's underpayment of rent: its policy was to allow tenants a grace period before pursuing remedies, and it rejected Simmons's tendered underpayments in October, November and December of 2019 and January of 2020.[9]

## D. The Trial Court Did Not Err in Rejecting Simmons's Remediation and Mitigation Offsets

Simmons's final argument is that the trial court erred by not reducing Gilmore's claimed damages by the sums Simmons describes as "remediation" and "mitigation" offsets. The remediation offset is based on the fair market value of Simmons's apartment, multiplied by the number of days – 75 – she contends the apartment was uninhabitable for reasons she attributes to Gilmore. The mitigation offset is the amount of rent Simmons tendered to Gilmore, but that Gilmore refused to accept. Simmons contends that Gilmore is barred from recovering damages it could have mitigated by accepting Simmons's tender.

We first address Simmons's remediation offset. She argues that the court should have deducted from Gilmore's damage award a sum equal to the daily fair market rent for her apartment multiplied by 75 days. It is Simmons's burden to prove her apartment was uninhabitable, (*Boyd v. Carter* (2014)

---

[9]     We reject out of hand Simmons's contention that Gilmore's rescission of the second rent increase returned Simmons's monthly rent to $1403.61, rather than to the new rate of $1538.61 that took effect on April 1, 2019. Simmons received timely notice of the April 1 rent increase. Gilmore's notice rescinding the second rent increase clearly stated that Simmons's monthly rent "return[ed] to the previous rate of $1,538.61," and Simmons testified that she "understood that the landlord believed she was obligated to pay" that amount.

227 Cal.App.4th Supp. 1, 7), and the trial court found she had failed to meet her burden of proof.

On appeal from a finding that a party has failed to meet its burden of proof, " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' [Citation.]" (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978-979.) "[U]nless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found [that party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.]" (*Bookout v. State of California ex rel Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

Here, the evidence is contradictory and does not compel a finding in Simmons's favor. "[The] implied warranty of habitability does not require that a landlord ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be maintained. In most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligation." (*Green v. Superior Court* (1974) 10 Cal.3d 616, 637, fn. omitted.) Gilmore's property manager testified that a city inspector visited Simmons's apartment and found it was habitable. Gilmore presented testimony and work records from its contractor, its on-site maintenance man, and its pest control contractor, all tending to show Gilmore had been responsive to Simmons's requests for

maintenance. The credibility of Simmons and of Gilmore's witnesses, and the weight to be afforded their testimony, was the sole province of the trial court. We do not second-guess its weighing of contested evidence. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

We need only briefly address Simmons's argument that by refusing Simmons's tender of rent in amounts less than she owed, Gilmore failed to mitigate its damages. Simmons cites no case to support the argument and we can find none. "Typically, the rule of mitigation of damages comes into play when the event producing injury or damages has already occurred and it then has become the obligation of the injured party to avoid continuing or enhanced damages through reasonable efforts." (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) The doctrine is used sparingly in the contract or commercial context. (*Ibid.*)

Here, Gilmore is suing on an express obligation to pay rent in a fixed sum. A creditor who refuses to accept less than the debtor's bargained-for performance does not thereby waive any portion of its damages in a subsequent action to enforce the contract. To the contrary, as stated nearly one hundred years ago and still applicable today: "No case has been called to our attention wherein this rule as to the duty to minimize damages has been applied to a situation in which the defendant's breach of duty consisted solely of the failure or refusal to pay a liquidated sum of money when due, and it may perhaps be doubted that the rule is applicable to such a case. It would seem the situation of the respondent is in this respect analogous to that of a lessor whose lessee has repudiated the lease and given notice that he will not perform it. It is held in such case that the lessor may elect to stand upon his contract and may recover the full rent for

15

the term, when it has become due, in accordance with the terms of the contract, or he may elect to treat the contract as abandoned and relet the premises to another tenant, in which event he can recover as damages only the difference between the rent he was to receive and the rent actually received from the subsequent tenant." (*Vitagraph, Inc. v. Liberty Theaters Co.* (1925) 197 Cal. 694, 698-699.)[10]

## DISPOSITION

The judgment is affirmed.  Gilmore is awarded its costs.

RICHARDSON, J.

We concur:

ASHMANN-GERST, Acting P. J.

CHAVEZ, J.

---

[10]     In fact, it may well have been error if the trial judge had applied the doctrine of mitigation of damages in this lease context.  (*Valle de Oro Bank v. Gamboa, supra,* 26 Cal.App.4th at p. 1694 [error to allow jury to consider doctrine of mitigation of damages where Bank was entitled to recover unpaid balance of the promissory note executed by defendant].)

16